**A.V. BY VERSACE, INC., Plaintiff,**

**v.**

**GIANNI VERSACE S.p.A. and Alfredo Versace, Defendants.**

**Gianni Versace S.p.A., Plaintiff,**

**v.**

**Alfredo Versace and Foldom International (U.S.A.), Inc., Defendants.**

**Gianni Versace S.p.A., Plaintiff,**

**v.**

**Alfredo Versace, L'Abbigliamento, Ltd. et al.   Defendants.**

**Nos. 96 Civ. 9721 PKL/THK, 98 Civ. 0123 PKL/THK, 98 Civ. 9645 PKL/THK.**

United States District Court, S.D. New York.

Aug. 30, 2006.

See also, 2006 WL 90062.

---

Elizabeth A. Adinolfi, Phillips, Nizer, Benjamin, Krim & Ballon LLP, New York, New York, for Plaintiff Gianni Versace S.p.A.

Leonard Zack, Leonard Zack & Associates, New York, New York, for Defendant Alfredo Versace.

## OPINION AND ORDER

LEISURE, District Judge.

This litigation between Gianni Versace S.p.A. ("Gianni") and Alfredo Versace ("Al-

fredo") arose in December 1996 in connection with defendant Alfredo's infringing use of certain Versace trademarks. Since that time, the Court has issued more than a dozen decisions, including several findings of contempt against Alfredo. Nearly a decade later, the case still lumbers forward. On January 24, 2005, the Court granted Gianni's request for the entry of a permanent injunction against Alfredo similar in all material respects to the modified preliminary injunction that had been in force since January 27, 2003 (the "Modified Preliminary Injunction"). *See A.V. By Versace, Inc. v. Versace,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2005 WL 147364, at *8 (S.D.N.Y. Jan.24, 2005). On January 12, 2006, the Court signed the permanent injunction (the "Permanent Injunction"). Meanwhile, Gianni has moved the Court to hold Alfredo in further contempt for continuing and ongoing violations of the Modified Preliminary Injunction. Specifically, Gianni requests that the Court refer the matter to the United States Attorney's Office for investigation into whether Alfredo has committed perjury before this Court. For the reasons set forth herein, Gianni's motion is granted.

### BACKGROUND

#### I. The Consolidated Actions

The factual and procedural background of these consolidated actions has been set forth in the Court's numerous decisions, with which the Court presumes familiarity. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2006 WL 90062 (S.D.N.Y. Jan.12, 2006); *A.V. By Versace,* 2005 WL 147364; *A.V. By Versace, Inc. v. Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2004 WL 691243 (S.D.N.Y. Mar.31, 2004); *Gianni Versace, S.p.A. v. Versace,* No. 01 Civ. 9645, 2003 WL 22023946 (S.D.N.Y. Aug.27, 2003); *Gianni Versace,*

*S.p.A. v. Versace,* No. 01 Civ. 9645, 2003 WL 470340 (S.D.N.Y. Feb.25, 2003); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618 (S.D.N.Y. Sept.3, 2002); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 191 F.Supp.2d 404 (S.D.N.Y.2002); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 160 F.Supp.2d 657 (S.D.N.Y.2001); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 126 F.Supp.2d 328 (S.D.N.Y.2001); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281 (S.D.N.Y.2000); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* No. 96 Civ. 9721, 1998 WL 832692 (S.D.N.Y. Dec.1, 1998); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* No. 96 Civ. 9721, 1997 WL 31247 (S.D.N.Y. Jan.28, 1997).

This case consists of three separate actions which have been consolidated by the Court. In December 1996, A.V. By Versace ("A.V."), a corporation claiming to hold a license to use certain Versace trademarks, commenced an action seeking injunctive relief and damages against Gianni and Alfredo after Gianni had sent a cease-and-desist letter to one of A.V.'s vendors. *See A.V. By Versace,* 1997 WL 31247, at *1. Gianni cross-claimed against Alfredo for a declaration regarding the manner in which Alfredo could use the Versace surname in the future. *See A.V. By Versace,* 1998 WL 832692, at *1. In January 1998, Gianni filed a separate lawsuit against Alfredo and Foldom International (U.S.A.), Inc. ("Foldom"), alleging trademark infringement, unfair competition, and trademark dilution. The Court consolidated the 1996 and 1998 actions in December 1998. *See id.* at *3.

Gianni initiated the third and final action on November 1, 2001. In that case, Gianni alleged trademark infringement against Alfredo, L'Abbigliamento, Ltd. ("L'Abbigliamento"), and Esrim Ve Sheva Holding

Corporation, in connection with the sale and promotion of a clothing line and watches. Gianni settled with Esrim Ve Sheva Holding Corporation and moved for summary judgment against Alfredo and L'Abbigliamento. *See Gianni Versace, S.p.A. v. Versace,* No. 01 Civ. 9645, 2003 WL 22023946, at *1, *4 (S.D.N.Y. Aug.27, 2003). On August 27, 2003, the Court granted Gianni's motion with respect to certain claims in so far as they sought injunctive relief, but denied summary judgment for monetary damages. *See id.* at *15. On January 24, 2005, the Court (1) consolidated the third action with the two previously consolidated earlier actions; (2) entered default judgments against Alfredo in the first two actions; and (3) granted Gianni's request for the entry of a permanent injunction against Alfredo that would be similar in all material respects to the Modified Preliminary Injunction currently in force. *See A.V. By Versace, Inc. v. Versace,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2005 WL 147364, at *15 (S.D.N.Y. Jan.24, 2005). Finally, as noted above, on January 12, 2006, the Court signed the Permanent Injunction.

## II. *The Preliminary Injunction*

On February 4, 1998, Judge Sidney H. Stein granted Gianni's request for a preliminary injunction against Alfredo Versace, issuing his decision from the bench. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 284 (S.D.N.Y.2000) (noting that Judge Stein issued his decision from the bench and then issued the preliminary injunction in writing on February 10, 1998). The preliminary injunction entered by Judge Stein (the "Preliminary Injunction") barred Alfredo from, *inter alia,* using or licensing the use of various "Infringing Marks" that incorporated the name "Versace" as well as the use of any other trademarks confusingly similar to those of Gianni. (Prel-

im.Inj.¶¶ 6–8, Feb. 10, 1998.) Although the injunction enjoined Alfredo from using his name as a trademark, it allowed him to use his name to identify goods that he had designed by use of the phrase "Designed by Alfredo Versace" as long as such goods prominently displayed the following disclaimer: "not affiliated with or authorized by Gianni Versace S.p.A." (Prelim.Inj.¶¶ 6–10.) The Preliminary Injunction also prohibited Alfredo Versace from delegating or licensing his rights to a middleman. However, it allowed manufacturers and distributors to use the name "Alfredo Versace" in accordance with the Preliminary Injunction, provided that they first agreed in writing to be bound by the Preliminary Injunction. (Prelim.Inj.¶ 13.)

In an Opinion and Order issued on January 4, 2001 (the "January 2001 Opinion and Order"), this Court clarified that the Preliminary Injunction applied extraterritorially. *See A.V. By Versace,* 87 F.Supp.2d at 341.

## III. *The Modified Preliminary Injunction*

On September 3, 2002, the Court found Alfredo in contempt of Court because of his numerous violations of the Preliminary Injunction. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618, at *9 (S.D.N.Y. Sept.3, 2002). Specifically, the Court found that Alfredo had been involved in the improper sale of watches, jeans, and handbags without the disclaimer required by the Preliminary Injunction; that Alfredo had marketed various products featuring the Infringing Marks on the Internet and failed to take the steps mandated by a previous Court order to stop such activities; and that Alfredo had been involved in a clothing enterprise with L'Abbligiamento using Infringing Marks and failing to use the required disclaimer.

*See id.* at \*7–9. In addition, the Court granted Gianni's motion to modify the preliminary injunction to prohibit Alfredo from using the Versace surname in any commercial context whatsoever. *See id.* at \*13. In so doing, the Court noted that "the record reflects a deliberate pattern of deception by which Alfredo Versace has repeatedly used his surname in ways designed to create the impression that his goods are associated with those of Gianni Versace, in violation of judicial orders to the contrary." *Id.* at \*12. The Court directed Gianni to submit a proposed modified preliminary injunction, and ultimately signed the Modified Preliminary Injunction on January 27, 2003. (*See* Modified Prelim. Inj., Jan. 27, 2003.)

## IV. *The History of Alfredo's Contempts*

The list of sanctions this Court has ordered against Alfredo is extensive, to state the matter lightly. It was on March 6, 2000, that the Court first found Alfredo in civil contempt for violating the preliminary injunction. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F.Supp.2d 281, 294–95 (S.D.N.Y.2000). Specifically, the Court held that Alfredo violated the preliminary injunction by using offshore Internet sites to advertise and distribute his products in the United States. *See id.* at 295. As a result of this violation, the Court ordered Alfredo to pay Gianni the sum of one-third of its costs and attorneys' fees incurred in making the contempt motion. *See id.* at 296.

In an Opinion and Order and Report and Recommendation dated January 9, 2002, United States Magistrate Judge Theodore H. Katz granted Gianni's motion for sanctions against Alfredo for his long-term refusal to obey three discovery orders issued by the Court. As a sanction for his misconduct under Rule 37 of the Federal Rules of Civil Procedure, Magistrate Judge Katz ordered Alfredo to pay Gianni's costs and attorneys' fees incurred in attempting to secure compliance with the discovery orders, and recommended that both Alfredo's answer in No. 98 Civ. 0123, and his answer and cross-claim in the related action, No. 96 Civ. 9721, be stricken. On March 21, 2002, this Court adopted Judge Katz's Opinion and Order and Report and Recommendation in its entirety, essentially causing a default for Alfredo in the instant consolidated action. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 191 F.Supp.2d 404, 405 (S.D.N.Y.2002).

As previously noted, on September 3, 2002, the Court again found Alfredo in contempt for various violations of the Preliminary Injunction. As part of this decision, the Court warned Alfredo that a conditional jail term would be considered if he continued to disregard the Court's orders. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618, at \*10 (S.D.N.Y. Sept.3, 2002) ("The Court will not impose the sanction of a conditional jail term on Alfredo Versace at this time, although Alfredo Versace should be aware that the Court will consider the efficacy of such a severe sanction if his transgressions continue.") Despite this clear warning, Alfredo's contumacious conduct continued. On August 28, 2003, the Court found that Alfredo had failed to purge himself of contempt, and that there existed new bases for holding Alfredo in further contempt. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F.Supp.2d 341 (S.D.N.Y. Aug.28, 2003). Alfredo's new transgressions included the delivery of bottled water with labels that included the word "Versace" and Alfredo's continued use of the business name "Versace Boutique." *Id.* at 352–53. The Court wrote that its "patience, while drawing quite thin, endures," and that "Alfredo will now have one last chance to avoid a conditional jail term." *Id.* at 355. Accordingly,

the Court gave Alfredo sixty days to purge himself of his contempt, and informed Alfredo that if he did not do so, "the Court will order his immediate imprisonment until such time as he is in compliance." *Id.* at 355. Astonishingly, Alfredo once again failed to obey a directive of this Court. On March 31, 2004, the Court ordered Alfredo to surrender to the United States Marshall for a term of civil commitment until he had complied with the requirements of the August 28, 2003, Order. *A.V. By Versace, Inc. v. Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2004 WL 691243, at *1 (S.D.N.Y. Mar.31, 2004). Alfredo avoided imprisonment on this occasion through a stipulation by the parties setting forth specific steps Alfredo would take to purge himself of contempt. (*See* Stip., May 17, 2004.) The stipulation included the desperate measure of an agreement by Alfredo's wife, Frances Versace, to take out a home-equity loan on her residence in an effort to satisfy a portion of the outstanding judgments against Alfredo. (Stip.¶ 1, May 17, 2004.)

## DISCUSSION

### I. *Standard for Contempt*

■ At this juncture of these proceedings, the parties are well aware of the legal standards governing contempt motions. Although the federal courts' inherent power to punish for contempt is a "firmly established principle," *People by Abrams v. Terry,* 45 F.3d 17, 23 (2d Cir. 1995) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)), this power is "significantly circumscribed," *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995). "The failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt." *Dunn v. N.Y. State Dep't of Labor,* 47 F.3d 485, 490 (2d

Cir.1995). Rather, a court can impose civil contempt sanctions only if (1) "the order violated by the contemnor is 'clear and unambiguous,' (2) the proof of non-compliance is 'clear and convincing,' and (3) the contemnor was not reasonably diligent in attempting to comply." *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2002 WL 2012618, at *6 (S.D.N.Y. Sept.3, 2002) (Leisure, J.) (quoting *Local 1804–1,* 44 F.3d at 1096).

■ In addition, a court's power to impose coercive civil contempt sanctions is limited by a party's ability to comply with the court's order. *See Badgley v. Santacroce,* 800 F.2d 33, 36–37 (2d Cir.1986). Thus, a party may defend against a finding of contempt by showing that his compliance is "factually impossible." *Id.* The classic example of the factual impossibility defense arises when a court orders a witness to produce a document that is not in his control. In such a situation, compliance is literally impossible, and any attempt at coercion will be ineffective; therefore, the contempt should be excused. *See id.; see also Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (Kearse, J.) (holding that the alleged contemnor bears the burden of producing evidence of his inability to comply).

■ A party's objectionable conduct need not be willful for the party to be found in contempt. Rather, " 'sanctions for civil contempt can be imposed without a finding of willfulness.' " *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989) (quoting *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 39 (2d Cir.1989)). "The fact that the prohibited act was done inadvertently or in good faith ... does not preclude a citation for civil contempt, for the sanction is remedial in nature." *Vuit-*

ton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 128 n. 2 (2d Cir.1979) (Kaufman, J.).

■ The distinction between civil and criminal contempt lies in the purpose of the sanction. Civil contempt sanctions may be either coercive—i.e., acting to secure a party's compliance with a court order—or compensatory with respect to the party that has been injured by the contemnor's conduct. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs.*, 369 F.3d 645, 657 (2d Cir.2004); *see also United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Criminal contempt, on the other hand, is punitive in nature, and seeks to vindicate the authority of the court. *Paramedics*, 369 F.3d at 657 (citing *Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.*, 705 F.2d 94, 96 (2d Cir.1983)). Unlike civil contempt sanctions, which a court may impose via an ordinary civil proceeding upon notice and an opportunity for the contemnor to be heard, criminal contempt sanctions " 'may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings.' " *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 826, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (quoting *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)). In the case of criminal contempt charges that involve possible imprisonment of more than six months, the alleged contemnor has the right to a jury trial. *Id.*

## II. Allegations of Uncured Past Contempts

The Court first addresses Gianni's allegations concerning Alfredo's failure to cure his past contempts. Specifically, Gianni alleges that (1) Alfredo has failed to pay attorneys' fees awarded to Gianni as part of the Court's prior orders; (2) Alfredo has failed to monitor the Internet for infringing web sites; and (3) Alfredo has failed to produce all available information related to his finances.

### A. Unpaid Judgments

■ Gianni notes that Alfredo continues to owe Gianni more than $120,000[1] in unpaid sanctions, and that Alfredo has failed to pay Gianni any money since 2004. Alfredo does not claim that the judgments ordering him to pay sanctions are not clear and unambiguous, and he does not dispute that he has not satisfied these judgments. Rather, Alfredo responds, as he has in the past, that he simply cannot afford to pay. (Def.'s Mem. Law Opp'n Mot. Contempt 13.) It is true that the Court's power to impose a civil contempt sanction is limited by a party's ability to comply with the Court's orders. *See Badgley v. Santacroce*, 800 F.2d 33, 36–37 (2d Cir.1986); *see also United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with [a] civil contempt action."). "[A] party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt." *Huber v. Ma-*

---

1. Judgments for attorneys' fees were entered against Alfredo on July 20, 2000 (*See* Order, July 20, 2000 (awarding Gianni attorneys' fees of $31,031.39)); July 22, 2002 (*See* Order, July 22, 2002 (awarding Gianni attorneys' fees of $31,741.05)); and September 3, 2002, *A.V. By Versace, Inc. v. Gianni Versace,* S.p.A., Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618 (S.D.N.Y. Sept.3, 2002). Subtracting the $70,000 payment made from proceeds of Frances Versace's home equity loan, the Court calculates that Alfredo owes Gianni $124,319.19.

*rine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (Kearse, J.). However, although Alfredo has submitted rafts of documentation piecemeal to the Court over the pendency of this case, the Court has never found that Alfredo lacks the ability to pay these judgments and relieved him of his obligation to pay in full the sanctions levied against him. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 279 F.Supp.2d 341, 354 (S.D.N.Y.2003) (finding that "until such time as Alfredo satisfies the judgments and fines or meets his burden of production [to show his inability to pay], he remains in contempt of this Court"). The contemnor bears the burden of producing evidence of his inability to comply. *See Huber,* 51 F.3d at 10. This burden, which is one of production, *see Rylander,* 460 U.S. at 757, 103 S.Ct. 1548, is not easily met, as an alleged contemnor must prove " 'plainly and unmistakably that compliance is impossible.' " *Huber,* 51 F.3d at 10 (quoting In re *Marc Rich & Co.,* 736 F.2d 864, 866 (2d Cir.1984)); *see also Hicks v. Feiock,* 485 U.S. 624, 638 n. 9, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). If an alleged contemnor fails to offer evidence of his inability to comply with the order, he has not satisfied his burden. *See Huber,* 51 F.3d at 10 (finding that because documents which alleged contemnor refused to produce might have shown that he did have assets and income, alleged contemnor failed to meet his burden of proving inability to pay); *see also Maggio v. Zeitz,* 333 U.S. 56, 75–76, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

Alfredo clearly has failed to meet his burden of production. This is not a close call by any means, for Alfredo has produced no documentation whatsoever to substantiate the conclusory assertion that he cannot afford to pay.[2] Until Alfredo either satisfies the judgments this Court has ordered him to pay or meets his burden of production with respect to his alleged inability to pay, Alfredo remains in contempt.

### B. *Internet Violations*

█ Gianni next alleges that Alfredo has failed to monitor the Internet for infringing web sites. This Court's September 3, 2002 Opinion and Order required Alfredo to take all reasonable steps to ensure that all Infringing Marks are removed from the Internet. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618, at *11 (S.D.N.Y. Sept.3, 2002). The Court previously has recognized that Alfredo does not control everything that happens on the Internet. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 279 F.Supp.2d 341, 351 (S.D.N.Y.2003). However, the Court also has found that "reasonable steps" include notifying the operators of web sites containing Infringing Marks that the use is not authorized, violates a court order, and must be removed. *Id.* at 352. The August 28, 2003 decision placed a clear and unambiguous continuing obligation on Alfredo to search the Internet, to send cease-and-desist letters to web sites displaying Infringing Marks, and to copy Gianni on these letters.[3] *Id.* Counsel for Gianni states that it

**2.** Alfredo's Memorandum of Law in Opposition to Gianni's contempt motion vaguely references certain documentation submitted to Gianni by his accountant in response to a subpoena by Gianni. (Def.'s Mem. Law Opp'n Mot. Contempt 13.) As this documentation was not provided to the Court in con-

nection with this motion, the Court is unable to evaluate its sufficiency.

**3.** The Court wrote:

So long as [Alfredo's counsel] continues to scour the Internet for Infringing Marks and continues to send cease and desist letters

has not received a copy of a cease-and-desist notice sent to an infringing web site since September 2004. (Pl.'s Mem. Supp. Mot. Contempt 12.) Meanwhile, Gianni has submitted printouts from a number of web sites offering for sale items using the "Alfredo Versace" label, including watches, umbrellas, cosmetics, t-shirts, and jeans. (Jacoby Aff. Ex. D.)

Alfredo does not defend himself by arguing that he has monitored the Internet adequately. Rather, Alfredo attacks the evidence put forth by Gianni to establish that items bearing the Infringing Marks have been and are being offered for sale on the Internet. Alfredo argues that the web sites produced by plaintiff "that purportedly contain a link to Alfredo Versace have not been shown to still be active or to have any present connection with Alfredo Versace." (Def.'s Mem. Law Opp'n Mot. Contempt 11.) Alfredo misses the mark entirely here. It matters not whether any Internet vender has a "connection" to Alfredo. Gianni does not claim that Alfredo has violated the Modified Preliminary In-

junction by acting, directly or indirectly, in concert with Internet venders. Rather, the key question is whether Alfredo has adequately monitored the Internet for infringing web activity, and, in those cases where Infringing Marks exist on web sites, what reasonable steps Alfredo has taken to ensure their removal.[4] Alfredo has not even attempted to argue that he has taken any steps, reasonable or otherwise, to ensure the removal of Infringing Marks from the Internet. Therefore, the Court finds that there is clear and convincing evidence that Alfredo has violated this Court's clear and unambiguous orders. Until Alfredo has satisfied the Court that he has continued to take reasonable steps to ensure that Infringing Marks have been removed from the Internet, he will remain in contempt of Court.

## C. *Information Concealment*

Gianni also alleges that Alfredo has failed to obey this Court's orders that he produce all available information related to his finances and the finances of any

---

when he finds such marks, the Court will be satisfied if a few additional steps are taken. Future cease and desist letters should reference the preliminary injunction. Gianni's attorneys should be copied on these cease and desist letters. At their discretion, Gianni's attorneys may notify Alfredo, through [Alfredo's counsel], of additional websites that contain Infringing Marks and Alfredo should cause cease and desist letters to be sent to the owners of those websites as well. Furthermore, [Alfredo's counsel] and/or Alfredo should periodically report to both Gianni and the Court on their efforts. Specifically, they should note Infringing Marks that they are unsuccessful in removing. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 279 F.Supp.2d 341, 352 (S.D.N.Y.2003); *see also A.V. By Versace, Inc. v. Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2004 WL 691243, at *8 (S.D.N.Y. Mar.31, 2004) (referencing Alfredo's continuing obligation to

monitor the Internet and send cease-and-desist letters).

4. Alfredo's claim that Gianni has not shown that any infringing sites are active is similarly misguided. Because Gianni does not allege that Alfredo is acting in concert with the operators of these web sites, the burden is not on Gianni to show that infringing sites are active, but rather on Alfredo to show he has taken reasonable steps to ensure the cessation of infringing activity. Regardless, the Court observes that a cursory search performed with the Internet search engine Google reveals that a number of the infringing sites cited by Gianni remain active to the present day. *See, e.g.,* http://www.ditta.co.kr/goods/goods.asp?gd=100657889 (offering for sale "H.K. Alfredo Versace" cosmetics) (last visited Aug. 23, 2006); http://gmarket.co.kr/challenge/neo_goods/goods.asp?goodscode=100657889 (same) (last visited Aug. 23, 2006); http://www.xs4all.nl/-sotty/gadget/Alfredo_Versace_Mens_Watch.html (offering for sale

businesses he controlled. (Pl.'s Mem. Law Supp. Mot. Contempt 12.) As part of its contempt finding in the September 3, 2002 Opinion and Order, the Court awarded Gianni a compensatory fine equal to any profits made by Alfredo in connection with his activities in violation of the Preliminary Injunction. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618, at *11 (S.D.N.Y. Sept.3, 2002). To allow Gianni to estimate this sum, Alfredo was ordered to provide to Gianni and the Court "a detailed statement of all net profits derived by Alfredo Versace from such licensing and sales throughout the world from February 4, 1998 until the date of this decision." *Id.* at *11. The Court's August 28, 2003 decision reiterated this requirement. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F.Supp.2d 341, 356 (S.D.N.Y.2003) ("[Alfredo] must submit an accountant's report that details his financial activity, and that of all of the entities he controls, from February 4, 1998 until September 3, 2002. He must delineate what profits were earned from activities that violated the preliminary injunction.") In June 2004, prior counsel for Alfredo assured the Court that all efforts were being made to gather all the relevant documents, and that Alfredo's accountant, Marc Roseman, had informed him that he had no additional documents to produce. (Hr'g Tr. 12:23–13:4, 14:7–11, June 17, 2004.) On August 4, 2004, Roseman sent Alfredo's counsel a letter confirming that his files did not contain "any notes, memos or ex-

planatory data supporting the tax returns prepared for" Alfredo.[5] (Jacoby Aff. Ex. K.) However, Gianni informs the Court that, in response to a recent subpoena, Roseman has produced documents never before seen in this action. (Pl.'s Mem. Law Supp. Mot. Contempt 13.) According to Gianni, Alfredo "had to be aware" that Roseman's prior representations were untrue. (Pl.'s Mem. Law Supp. Mot. Contempt 13.)

Alfredo states that the documents provided by Roseman were not new documents, but rather additional documents that exceeded the timeframe requested in Gianni's subpoena.[6] (Alfredo Versace Aff. ¶ 16, Oct. 19, 2005.) However, a review of these documents indicates that they include what appear to be general ledger sheets showing details of deposits and withdrawals made with respect to the Versace Boutique account during 1998 and 1999, years which are within the relevant time period of this Court's directive that Alfredo produce "a detailed statement of all net profits" that Alfredo derived from licensing and sales that violated the Preliminary Injunction throughout the world from February 4, 1998 until September 3, 2002. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, Nos. 96 Civ. 9721, 98 Civ. 0123, 2002 WL 2012618, at *11 (S.D.N.Y. Sept.3, 2002); *see also A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F.Supp.2d 341, 350 (S.D.N.Y.2003) (reiterating this requirement and finding Alfredo remained in contempt for failing to satisfy the requirement). The documents

---

an "Alfredo Versace" watch) (last visited Aug. 23, 2006).

5. This letter was produced in response to a subpoena to Gianni. (Jacoby Aff. ¶ 7.)

6. Alfredo also claims that Roseman's August 4, 2004 letter was not technically inaccurate, because "for a period of time, my accountant ... did not have any more documents re-

sponsive to Gianni Versace's subpoena in his possession, since such documents were forwarded to Estela Lorenzo, a certified public accountant for review." (Alfredo Versace Aff. ¶ 16, Oct. 19, 2005.) The Court will pass over this tortured explanation, as it does not touch upon the key question, which is whether Alfredo was aware that such documents existed, regardless of which individual was their custodian at any given time.

also include various notes that, Gianni alleges, appear to have been made in Alfredo's hand. (Pl.'s Mem. Law Supp. Mot. Contempt 13; Adinolfi Decl. ¶ D, Nov. 2, 2005.)

Gianni indeed has raised the possibility that Alfredo has concealed information. But the Court is not in a position to find Alfredo in contempt on such a limited presentation. Gianni has devoted a total of two paragraphs between two briefs to this matter. While it would be a reasonable inference that Alfredo was aware that Roseman had additional information, more is required for a showing of contempt. The Court finds that Gianni has not shown clear and convincing evidence that Alfredo has concealed information.

### III. Allegations of New Contumacious Conduct

Gianni also moves the Court to find Alfredo in further contempt on the basis of new violations of the Modified Preliminary Injunction. As to Alfredo's continued contumacious conduct, Gianni alleges that (1) Alfredo violated the Modified Preliminary Injunction by participating in a May 2005 charity auction and donating various items without providing event organizers with any guidance regarding how his name could be used; and (2) Alfredo attempted to launch, via dealings with a distributor named John Papettas, a brand of cigarettes and bottled water in violation of the Modified Preliminary Injunction through a surreptitiously-incorporated Pennsylvania entity. Gianni also alleges that Alfredo has committed perjury by concealing the existence of this Pennsylvania entity when questioned in open court at a hearing held before this Court on July 29, 2004.[7] With respect to Alfredo's alleged perjury, Gianni requests that the Court refer the matter to the United States Attorney's Office for investigation.

On May 9–12, 2006, the Court held an evidentiary hearing, at which the parties called witnesses and presented evidence with respect to Gianni's allegations concerning Alfredo's relationship with John Papettas and his conduct at the May 2005 charity auction.[8]

---

[7]. Gianni also alleges that Alfredo, by omitting "Mark Versace Boutique" from a May 12, 2004 affidavit in which he detailed his use of the "Versace Boutique" as a business name as required by the Court's August 28, 2003 Opinion and Order, has provided a false affidavit. (Pl.'s Mem. Law Supp. Mot. Contempt 4.) This affidavit is not listed on the docket of any of the three consolidated cases, and the Court has no record of having received it. Accordingly, the Court cannot consider this allegation at this time.

[8]. The evidentiary hearing was limited to issues raised by Alfredo in letters he sent to the Court following the submission of the parties' contempt motion papers, and in which he challenged the veracity of certain declarations that accompanied Gianni's motion. See Mar. 1, 2006 Order. Specifically, by letter dated November 4, Alfredo's counsel, Leonard Zack, Esq., made various allegations concerning the two declarations of John Papettas, including that a document identified as a letter of intent from Alfredo giving Papettas exclusive rights to market cigarettes under the "A.V. Versace" trademark, (see Papettas Decl. Ex. B, Nov. 1, 2005), contained a forged signature purporting to be Alfredo's. See Letter from Leonard Zack, Esq., to the Court, dated Nov. 4, 2005, at 1–2.

Also, by letter dated November 14, 2005, Zack claimed that he had learned, through his own investigation, that the declaration of Scott Perrin dated November 2, 2005, includes statements that Perrin now considers to have been coerced by Gianni's counsel. See Letter from Leonard Zack, Esq., to the Court, dated November 14, 2005, at 1–2. In an affidavit that accompanied Zack's November 14 letter, Perrin stated, inter alia: (1) that he had not been interested in providing a declaration and ultimately only signed the declaration because Gianni's counsel told him that he would be subpoenaed if he did not sign it; and (2) that he had refused to sign an

## A. *The Charity Auction*

According to Gianni, Alfredo violated the Modified Preliminary Injunction in May 2005 when he participated in a charity event designed to raise money for the Wildlife Trust and the Paul Sorvino Asthma Foundation. (Pl.'s Mem. Law Supp. Mot. Contempt 10.) Gianni alleges that Alfredo donated merchandise for the auction and allowed them to be promoted as "Versace" goods by failing to provide the event organizers with a copy of the Modified Preliminary Injunction or to give them any guidance at all regarding how his name could be used. (Pl.'s Mem. Law Supp. Mot. Contempt 10–11.) This lack of guidance, according to Gianni, resulted in advertising for the event that stated that included among the silent auction items were "luxury designer goods from ... Versace." (Pl.'s Ex. 1.) However, Alfredo claims that because he made a reasonable effort to ensure that the Versace name was not used in connection with the event, he therefore cannot be held responsible for a violation of the Modified Preliminary Injunction.

The facts regarding the events that took place at the charity auction were addressed by sworn statements submitted by the parties and at the evidentiary hearing. Alfredo testified that he made clear to an event organizer that the Modified Preliminary Injunction barred the use of the Versace name in connection with the auction (Hr'g Tr. 376:23–377:11, May 11, 2006); that he never was shown a copy of the event's advertisement or invitations (Hr'g Tr. 378:23); and that he inspected the donated items to ensure that no tags or

labels bearing the Versace name were attached (Hr'g Tr. 379:4–16).

Much of Alfredo's account of the auction was corroborated by the testimony of Robert Lane, a vice president at Wildlife Trust, Inc., the sponsor of the auction. Lane testified that he first met Alfredo at an event at the 21 Club in Manhattan in November 2004. (Hr'g Tr. 17:8, May 9, 2006.) Lane said that Alfredo told him that he knew Lane had put on fundraising events with Paul Sorvino for the Sorvino Asthma Foundation, and said that he would like to donate some materials to help with Wildlife Trust's upcoming charity auction. (Hr'g Tr. 17:16–22.) Lane testified that Alfredo told him that his name could not appear on any of the donated goods, that he was in litigation regarding the use of his name, and that he was not allowed to use his name in any manner related to the donated goods. (Hr'g Tr. 26:1–6.) Lane said that he, Alfredo, and another man, Charles Ursitti, personally inspected the goods to ensure that no labels bearing the name "Versace" were on them. (Hr'g Tr. 15:17–16:2.) Lane did not know how the name "Versace" came to appear on the advertisement that publicized the event. The advertisement for the event was largely a reprinting of the invitation for the event, the language of which was drafted by Scott Perrin (Hr'g Tr. 110:23–111:2) and Elizabeth Shockley, a woman who was no longer with the company (Hr'g Tr. 19:11, 27:12–13). Lane saw the invitation more than a week before the event, but did not recall whether he had proofread it and noticed the reference to "Versace" or the listing of "Alfredo Versace" as one of the

---

initial draft of the declaration that included the statement that Alfredo's "involvement in the fundraiser stemmed from his friendship with Mr. [Paul] Sorvino[, the event's host]." (Perrin Aff. ¶¶ 5–7.) Alfredo's accusations with respect to Perrin's November 2 declaration are baseless. The sentence whose inclusion in the initial draft Perrin objected to was removed from the version that Perrin signed (*see* Perrin Decl.), and the Court has found no evidence that Gianni's counsel coerced Perrin's declaration in any way.

donors. (Hr'g Tr. 24:6–23.) Perrin, who never met Alfredo prior to the auction (Hr'g Tr. 93:2), testified that Lane presented Alfredo's items to him as "Versace" items (Hr'g Tr. 112:3). Perrin said that no one affiliated with Wildlife Trust, including Lane, told him there were any restrictions on the use of Alfredo's name in connection with the promotion of the event. (Hr'g Tr. 112:12–14.) Lane could not recall whether he told Shockley or Perrin that the Versace name could not be used in connection with the event. (Hr'g Tr. 26:13–18, 34:22–25.)

Lane did not provide Alfredo with a copy of the invitation, and did not believe anyone else in Wildlife Trust had done so. (Hr'g Tr. 32:20–25.) Gianni also questioned Lane on the subject of Alfredo's appearance on the donor list:

Q. Did you ask Mr. Versace if he could be—if he should be listed as a donor on this invitation?

A. No.

Q. Did you tell Mr. Versace he would be listed as a donor on this invitation?

A. No.

Q. Did you tell Mr. Versace that you would use the fact that he was donating goods to promote the event?

A. No, he didn't want his name—the name used at all.

(Hr'g Tr. 23:4–13.) When Perrin was asked how it was that Alfredo came to be listed as a donor for the event, Perrin explained that Alfredo was listed for the simple reason that he had items in the auction, and that it was Perrin's practice to "err on the side of inclusion rather than exclusion." (Hr'g Tr. 112:18–22.)

As became clear at the evidentiary hearing, the use of the "Versace" name in connection with the auction was not limited to the advertisement and invitations. The auction consisted of a group of tables, on each of which was placed an item for auction, along with a "bid sheet," which included a description of the item and lines for the bidder's name and the amount of his or her bid. (Hr'g Tr. 28:1–13.) The bid sheets were created by Scott Perrin (Hr'g Tr. 118:9), who testified that the items donated by Alfredo were listed as "Versace" items on the bid sheets (Hr'g Tr. 118:10–14). Perrin also helped prepare an auction "catalog," a sheet of paper that listed all the auction lots to serve as a reference for bidders. (Hr'g Tr. 113:11–18.) The catalog listed the items donated by Alfredo as "Versace" items. (Hr'g Tr. 113:21.) Robert Lane saw the catalog, according to Perrin, and never informed Perrin that the Versace name was listed improperly. (Hr'g Tr. 113:22–114:4.) Alfredo testified that he never was shown or saw the event catalog or the "bid sheets" that accompanied the donated items and which bore the "Versace" name in violation of the Modified Preliminary Injunction. (Hr'g Tr. 378:22–379:1, May 11, 2006.)

B. *Mark Versace Boutique, Inc.*

The most serious allegations leveled by Gianni concern an alleged scheme by Alfredo to use a puppet corporation, Mark Versace Boutique, Inc. ("MVB"), to violate the terms of the Modified Preliminary Injunction. Mark Versace is Alfredo Versace's son. According to Gianni, Alfredo directed the incorporation of MVB on November 19, 2003, in Pennsylvania in the belief that he could avoid the jurisdiction of the Court. (Pl.'s Mem. Law Supp. Mot. Contempt 6; Papettas Decl. ¶ 11, Oct. 10, 2005; Hr'g Tr. 300:21–24, May 10, 2006.) The corporation shares the same address as that of Alfredo's accountant, Marc Roseman. (Pl.'s Mem. Law Supp. Mot. Contempt 5; Jacoby Aff., Ex. G.) Through MVB, Gianni alleges, Alfredo (1) attempted to transact business with an exporter named John Papettas, providing Mr. Pa-

pettas with various mock-ups of packaging for cigarettes and bottled water and ultimately reaching an agreement to distribute cigarettes with Mr. Papettas (Papettas Decl. ¶¶ 2–13, Oct. 10, 2005); and (2) attempted to transact business with a North Carolina tobacco company, Alternative Brands, Inc., providing the company with various packaging using the labels "Designed by Alfredo Versace" and "Designed by Mark Versace" (Phelps Decl. Exs. B, C).

### 1. *The Declarations and Testimony of John Papettas*

By his own account, John Papettas is an entrepreneur in the business of exporting American-made cigarettes throughout the world. (Papettas Decl. ¶ 1, Oct. 10, 2005.) He met Alfredo in 2001, and over the next two years, the two discussed various ventures involving the sale of cigarettes using a "Designed by Alfredo Versace" label. (Pl.'s Mem. Law Supp. Mot. Contempt 9; Papettas Decl. ¶¶ 2–3, Oct. 10, 2005.) According to Papettas, throughout the pair's business relationship, Alfredo never advised Papettas that any limitations had been placed on his use of the "Versace" name. (Pl.'s Mem. Law Supp. Mot. Contempt 9; Papettas Decl. ¶ 4, Oct. 10, 2005.)

In late 2003, Gianni alleges, Alfredo began to use the "Designed by Mark Versace" label in place of "Designed by Alfredo Versace." (Pl.'s Mem. Law Supp. Mot. Contempt 9–10; Papettas Decl. ¶ 5, Oct. 10, 2005.) Around this time, according to Gianni, Alfredo provided Papettas with articles of incorporation for Mark Versace Boutique, Inc. (Papettas Decl. ¶ 7, Ex. A, Oct. 10, 2005); mock-ups of cigarette packages bearing the "Designed by Mark Versace" label (Papettas Decl. ¶ 8, Ex. B, Oct. 10, 2005); a "Designed for Mark Versace" water bottle label (Papettas Decl. ¶ 9, Ex. C, Oct. 10, 2005); and a "Mark Versace"

logo (Papettas Decl. ¶ 10, Ex. D, Oct. 10, 2005). At the hearing, Papettas testified that Alfredo had told him he had MVB incorporated in Pennsylvania so that it could be the corporate entity through which he sold cigarettes. (Hr'g Tr. 287:13–19, May 10, 2006.) According to Papettas, Alfredo told him that he had chosen this location for MVB's incorporation because he had a contact in Philadelphia with friendly connections to a local judge (Hr'g Tr. 300:21–24), and that as a consequence Papettas need not worry about the Modified Preliminary Injunction (Hr'g Tr. 297:5–12). Papettas states that he never had any dealings with Mark Versace, having instead dealt exclusively with Alfredo. (Papettas Decl. ¶ 6, Oct. 10, 2005.)

As proof of the business relationship between Papettas and Alfredo, Gianni has submitted a document identified as a signed letter of intent (the "Letter of Intent") from Alfredo, dated August 12, 2003, giving Papettas exclusive rights to market cigarettes under the "A.V. Versace" trademark. (Papettas Decl. ¶ 4, Ex. B., Nov. 1, 2005.) According to Papettas, Alfredo signed this document in his presence at a dinner at a restaurant in Queens, New York, the purpose of which was to celebrate the culmination of their business relationship, and which was attended by Papettas, Papettas's girlfriend, Alfredo, and a woman named Wendy Yang, who was Alfredo's girlfriend. (Hr'g Tr. 259:13–264:3; Hr'g Tr. 351:5–10, May 11, 2006.)

Papettas claims to have made significant preparations for his co-venture with Alfredo, including making arrangements with several distributors, both in the United States and abroad. (Papettas Decl. ¶ 14, Oct. 10, 2005) Gianni has produced a document entitled "Certificate for Distribution Route," which states that Papettas "grants

an exclusive 10 year[9] distribution route of Versace Cigarette and other tobacco products for Northeast and Southeast Asia including Taiwan, China, Hong Kong and Macao" to Harry Shang, President and Chief Executive Officer of a company called Wintech International Group, Inc. (Papettas Decl. ¶ 14, Ex. F, Oct. 10, 2005.) Neither party contends that MVB venture resulted in any sales, however.

While Papettas was aware that there was litigation between Alfredo and Gianni, he said he was not aware that any limitations had been placed on Alfredo's use of the "Versace" name until the spring of 2004, when he read a newspaper article that referenced the matter. (Hr'g Tr. 300:2–5, May 10, 2006.) At this point, Papettas claims, he tried to convince Alfredo to go to Gianni and attempt to acquire a license to sell cigarettes. (Hr'g Tr. 242:7–9 ("I says we go with the law, maybe we can buy, and I help you to buy the franchise from Gianni Versace and we go legally make the cigarettes.").) Although Alfredo balked at this suggestion (Hr'g Tr. 243:5–10), Papettas continued to work with Alfredo through 2004. By November 2004, Papettas and Alfredo had reached a tentative oral agreement regarding the distribution of cigarettes and were in the process of finalizing a written contract. (Pl.'s Mem. Law Supp. Mot. Contempt 9; Papettas Decl. ¶ 13, Oct. 10, 2005.) Gianni has submitted a copy of a document entitled, "Exclusive Master Distribution Agreement," pursuant to which MVB appoints Papettas's corporation with the exclusive rights to distribute worldwide cigarettes bearing the "Mark Versace" name.

(Papettas Decl. ¶ 13, Ex. E, Oct. 10, 2005.) This draft agreement (the "Draft Agreement") is marked throughout by handwritten notes that Papettas states were made by Alfredo (see Papettas Decl. ¶ 13, Ex. E, Oct. 10, 2005). Shortly after the creation of the Draft Agreement, Papettas ended his business relationship with Alfredo, after realizing that Alfredo was attempting to cut Papettas out of the business and instead deal directly with Papettas's foreign distributors. (Papettas Decl. ¶ 17, Oct. 20, 2005; Hr'g Tr. 273:23–15.)

### 2. Alfredo's Version of Events

Alfredo acknowledges that he worked with Papettas as part of Alfredo's bottled-water business prior to the entry of the Modified Preliminary Injunction in 2002. (Alfredo Versace Aff. ¶ 3, Oct. 19, 2005; Hr'g Tr. 441:14–25, May 11, 2006.) However, Alfredo claims that he has had no involvement with MVB. Rather, Alfredo alleges that MVB was incorporated by his son, Marc Versace. (Alfredo Versace Aff. ¶ 15, Oct. 19, 2005; Mark Versace Aff. ¶¶ 2–3.) Alfredo states that he did not direct his son to incorporate MVB, and that he merely "recommended to [his] son that he use an office that was available in the suite belonging to [his] accountant," Mark Roseman. (Alfredo Versace Aff. ¶ 15, Oct. 19, 2005.) According to Alfredo, Papettas told him in the fall of 2003 that he was interested in selling cigarettes with his son under the MVB label. (Alfredo Versace Aff. ¶ 4, Oct. 19, 2005.) Although Alfredo told Papettas that this Court had prohibited him from conducting business using the name "Versace,"[10] Papettas con-

9. The certificate states that the distribution agreement would expire on July 16, 2013. (Papettas Decl. ¶ 14, Ex. F, Oct. 10, 2005.)

10. Alfredo attempts to support his version of events with the affidavit of Evelyn Van Cott, who states that she met Alfredo in October

2003 at a New Jersey diner, a meeting arranged by Papettas, and "sought to have Alfredo Versace design fashion items for dogs under the Alfredo Versace label." (Van Cott Aff. ¶¶ 2–5.) According to Van Cott, "Alfredo explained to me that he was shut down by a Court Order and that he would be unable to

tinued to approach Alfredo, ultimately threatening to speak to Gianni's lawyers if Alfredo did not convince his son to sign an exclusive distribution deal with Papettas. (Alfredo Versace Aff. ¶¶ 4–6, Oct. 19, 2005.) Alfredo also claims that a business associate of Papettas's told him that the law firm representing Gianni had promised to give Papettas a license in return for information regarding Alfredo's conduct with MVB.[11] (Alfredo Versace Aff. ¶¶ 8, Oct. 19, 2005.)

For his part, Mark Versace, in an affidavit submitted in support of Alfredo's memorandum of law in opposition to Gianni's contempt motion, states that Papettas approached him in the fall of 2003 with the idea of creating a corporation for the sale of tobacco products outside the United States using Mark Versace's name. (Mark Versace Aff. ¶ 2.) After some period of negotiation,[12] Mark Versace agreed to incorporate MVB [13] and produce cigarettes for the territory of Cyprus. (Mark Versace Aff. ¶ 3.) However, Mark Versace states that he soon after "became aware" that Papettas "was an illegitimate businessman" and was attempting to pressure him to agree to a distribution deal that

included approximately fifty countries. (Mark Versace Aff. ¶ 5.) According to Mark Versace, Papettas threatened him on two occasions in an attempt to coerce his agreement to the distribution deal that Papettas sought. (Mark Versace Aff. ¶¶ 6–8.) Mark Versace states that ultimately he refused to do business with Papettas. (Mark Versace Aff. ¶ 9.)

### 3. The Letter of Intent and the Draft Agreement

■■■■ With regard to the Letter of Intent, Alfredo asserts that his signature has been forged. (Alfredo Versace Aff. ¶ 3, Mar. 6, 2006.) At the evidentiary hearing, Yang testified that she had attended the dinner at the Queens restaurant at which Papettas claims Alfredo signed the Letter of Intent, and that she had no recollection of any business documents being exchanged or signed. (Hr'g Tr. 341:16–19, May 11, 2005.) In addition, Alfredo also called Julia Bevaqua, a handwriting expert. Bevaqua testified that the signature on the Letter of Intent was made in a different hand than those on sixteen "known documents" that included authentic signatures of Alfredo.[14] (Hr'g Tr.

produce the canine fashions under *his name.*" (Van Cott Aff. ¶ 5 (emphasis added).) Van Cott states that this conversation occurred in Papettas's presence. (Van Cott Aff. ¶ 7.) Van Cott, however, does not state that Alfredo told her that he was barred from using not only "his name," i.e. "Alfredo Versace," but rather the "Versace" name itself. In this respect, Van Cott's affidavit does not contradict Gianni's claim that Alfredo was preparing to switch to the "Designed by Mark Versace" label and to incorporate MVB in November 2003.

11. Alfredo has gone to some lengths to suggest that Gianni has procured the declarations and testimony of Papettas by promising him a licensing deal. Alfredo has presented no credible evidence of any such quid pro quo arrangement.

12. In his affidavit, Mark Versace states that "I am in the process of obtaining the phone records which will reflect the calls placed and received by me from John Papettas" during this negotiation period. (Mark Versace Aff. ¶ 2, Oct. 24, 2005.) Alfredo has not submitted any such records to the Court, either with his moving papers or in connection with the evidentiary hearing.

13. Mark Versace states that the incorporation papers for MVB were prepared by his attorney, Marina Kats. (Mark Versace Aff. ¶ 4, Oct. 24, 2005.)

14. Gianni objected to Bevacqua's testimony not on the basis of her individual qualifications, but rather on the grounds that the testimony of handwriting experts does not, as a general matter, satisfy the standards set forth

85:10–23, May 9, 2006.) Gianni did not produce a handwriting expert to testify that the signature on the Letter of Intent was, in fact, Alfredo's.[15]

Alfredo also denied that the hand-printed notes on the Draft Agreement were made by him. (Hr'g Tr. 370:10–371:2, May 11, 2006.) Gianni argues that the hand-printed notes on the Draft Agreement are made in a peculiar style that includes, among other things, a mixture of uppercase and lowercase letters, with the letters "t" and "i" consistently tending to appear in lowercase. (*See* Adinolfi Decl. ¶ 2, Nov. 2, 2005; Pl.'s Ex. 7.) At the hearing, Gianni showed Alfredo, for identification purposes, several documents with printing in a style similar to those on the Draft Agreement. In every case but one, Alfredo denied recognizing the printing as

his own. (Tr. 383:20–384:18; 385:8–385:25; 386:20–388:13; 389:1–17; 432:1–434:18.) The lone exception was a personal check submitted as part of the expert report of Bevacqua. (*See* Def.'s Ex. B; Hr'g Tr. 382:35–383:3.) This check was made in the amount of $3,000 and drawn on the account of Yang, who testified that she signed the check blank and gave it to Alfredo so that he would be able to pay Bevacqua for her services. (Hr'g Tr. 360:9–361:2.) The name "Julia Bevacqua" is hand-printed on the check's "pay to the order of" line. (*See* Def.'s Ex. B.) The name is printed in all capital letters with the exception of a lowercase "q" and a lowercase "i." (*See* Def.'s Ex. B.) On cross-examination, Alfredo admitted that he had printed the name "Julia Bevacqua" on this check. (Hr'g Tr. 383:3.)

by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) for expert testimony. Mindful of the *Daubert* factors, the Court found Bevaqua qualified under Federal Rule of Evidence 702 based on her "knowledge, skill, training, experience, [and] education," Fed.R.Civ.P. 702, and because her testimony would "assist the trier of fact ... to determine a fact in issue," *id.*, viz., the authenticity of the signature on the Letter of Intent. The Court is aware of no case in this jurisdiction in which a district court has excluded the testimony of a handwriting expert based on a finding that forensic document examination does not pass the *Daubert* standard. Moreover, although some district courts have restricted the testimony of handwriting experts to explaining to a jury the similarities and differences between known and questioned handwriting samples, *see, e.g., United States v. Oskowitz*, 294 F.Supp.2d 379, 383–84 (E.D.N.Y.2003) (collecting cases), the Second Circuit has never held that a handwriting expert may not offer an opinion on the ultimate question of authorship. In fact, every circuit court that has considered this question has concluded that a properly admitted handwriting expert may offer an opinion regarding the authorship of a handwriting

sample if the factors enumerated in *Daubert* are satisfied. *See United States v. Prime*, 431 F.3d 1147, 1151–54 (9th Cir.2005); *United States v. Crisp*, 324 F.3d 261, 271 (4th Cir. 2003); *United States v. Mooney*, 315 F.3d 54, 61–63 (1st Cir.2002); *United States v. Jolivet*, 224 F.3d 902, 905–06 (8th Cir.2000); *United States v. Paul*, 175 F.3d 906, 909–12 (11th Cir.1999); *United States v. Jones*, 107 F.3d 1147, 1161 (6th Cir.1997); *United States v. Velasquez*, 64 F.3d 844, 850–52 (3d Cir.1995).

15. Instead, Gianni offered Mark Denbeaux, a law professor, to testify not as a handwriting expert, but rather as a critic of the field of handwriting analysis in general and to the weight that the Court should place on Bevacqua's testimony. (Hr'g Tr. 215:24–216:4, May 10, 2006.) Denbeaux himself was clear that he was not a handwriting expert. (Hr'g Tr. 212:12–14 ("I have never said I'm a handwriting expert. I am an expert on the methodology and defects of handwriting [analysis]. It is quite a different thing.").) The Court, recognizing its own capability of assessing the weight of Bevacqua's expert testimony and thus finding that Denbeaux's testimony would not "assist the trier of fact," Fed.R.Evid. 702, in determining the authenticity of the signature on the Letter of Intent, found that Denbeaux was not qualified to testify as an expert under Rule 702. (Hr'g Tr. 218:2–13, 225:11.)

#### 4. *Alternative Brands, Inc.*

Gianni also alleges that Alfredo violated the Modified Preliminary Injunction by doing business with a North Carolina tobacco company called Alternative Brands, Inc. According to Gianni, Alfredo began doing business with Alternative Brands in late 2003, around the same time MVB was incorporated. (Pl.'s Mem. Law Supp. Mot. Contempt 6; Phelps Decl. ¶ 1.) In support of its motion, Gianni has provided the Court with the declaration of Calvin Phelps, the president of Alternative Brands. Phelps states that he first met Alfredo in late 2003, and that Alfredo represented himself as a cousin of Gianni Versace who had been "forced out on his own by Donatella Versace in the wake of Gianni Versace's death." (Phelps Decl. ¶ 1.) Phelps states that Alfredo never provided anyone at Alternative Brands with a copy of the Preliminary Injunction and never mentioned to anyone at Alternative Brands that a federal court had imposed any restrictions on his use of the Versace name. (Phelps Decl. ¶ 2.) According to Phelps, Alfredo wanted Alternative Brands to produce and package cigarettes for him under the label "Designed by Alfredo Versace" (Phelps Decl. ¶ 1), and provided Alternative Brands with a "Designed by Alfredo Watch" wristwatch,[16] as well as various pre-made packages for cigarettes that Gianni alleges violate the Preliminary Injunction and Modified Preliminary Injunctions. (Phelps Decl. Exs. B, C.)

Phelps has provided the Court with a photocopy of a cigarette package prominently bearing the "Designed by Alfredo Versace" label. (Phelps Decl. Exs. B, C.) He also has provided a photocopy of cigarette packaging bearing the label "Designed by Mark Versace." (Phelps Decl. Ex. C.) Phelps states that Alternative Brands never had any dealings with Mark Versace, but rather always dealt with Alfredo. (Phelps Decl. ¶ 4.)

Alfredo does not deny that he had a relationship with Phelps or that he provided Alternative Brands with packaging that, on its face, would violate the terms of the Modified Preliminary Injunction if he had given it to Phelps during the timeframe alleged by Gianni. Rather, he claims that the entirety of his interactions with Phelps occurred in 2001—including, by implication, his providing of packaging bearing the "Designed by Alfredo Versace" label— prior to the entry of the Modified Preliminary Injunction which barred Alfredo from using his name in the transaction of business anywhere in the world. (Alfredo Versace Aff. ¶ 11, Oct. 19, 2005.) Alfredo states that he met Phelps in 2001, not 2003. (Alfredo Versace Aff. ¶¶ 11–12, Oct. 19, 2005.) To that end, Alfredo has submitted the affidavit of Edward L. Van Deventer, Jr., who states that he personally witnessed Phelps with Alfredo in 2001 in both social settings and with respect to business transactions relating to tobacco products.[17] (Van Deventer Aff. ¶ 5.)

16. Alfredo states that he gave Phelps the watch in 2001 because Phelps "asked that I sent him an old watch that I produced and I accommodated his request," and that Alfredo "had no plans on making watches with Phelps." (Alfredo Versace Aff. 13.)

17. Van Deventer's affidavit states that he has "been involved in the marketing, packaging, and distribution of tobacco products and [has] discussed with Alfredo Versace the distribution of cigarettes outside the United States."

(Van Deventer Aff. ¶ 2.) Van Deventer also states that he is "not aware of any tobacco products being produced for or being sold by Alfredo Versace in the fall of 2003." (Van Deventer Aff. ¶ 6.) Neither Van Deventer, nor Alfredo in his moving papers or affidavits, supplies any reason why Van Deventer's lack of awareness on this point is probative of the question whether Alfredo supplied Alternative Brands with packaging that violated the Modified Preliminary Injunction, however. Alfredo also submits the affidavit of Elizabeth

**IV.** *The Court's Findings Regarding Gianni's Allegations of Alfredo's New Contumacious Conduct*

### A. The Auction

■ First, the Court rejects Gianni's claim that Alfredo violated the Modified Preliminary Injunction because he failed to provide anyone at Wildlife Trust with a copy of the injunction. As stated above, to hold a party in civil contempt, the Court must find that the violated order was clear and unambiguous. It is not clear and unambiguous in the Modified Preliminary Injunction that Alfredo should have provided a copy of the injunction to the organizers of the charity auction. The Modified Preliminary Injunction explicitly required Alfredo to provide a copy of the Modified Preliminary Injunction "to all present and former licensees, franchisees, customers and distributors." (Modified Prelim. Inj. ¶ 13, Jan. 27, 2003.) It did not explicitly require Alfredo to provide a copy of the injunction to *future* licensees, franchisees, customers and distributors.

■ However, there is no question that the goods donated by Alfredo were promoted as "Versace" goods in clear violation of the Modified Preliminary Injunction. Alfredo does not dispute that the language on the advertising and invitations for the event, referring to "luxury designer goods from ... Versace" violated the Modified Preliminary Injunction on its face, although Alfredo does make a halfhearted attempt to argue that because he received no compensation for his activities in connection with the auction, his conduct does not warrant being held in contempt.

(Def.'s Mem. Law Opp'n Mot. Contempt 12.) There is no philanthropic exception in trademark law or this Court's prior orders. The Modified Preliminary Injunction was cast in extremely broad language, enjoining Alfredo *"from making any* use anywhere in the world *of the name 'Versace'* in connection with the licensing, manufacture, offering for sale, sale, distribution or *promotion* of goods or services." (Modified Prelim. Inj. ¶ 10, Jan. 27, 2003 (emphasis added).) Therefore, the Court finds that Gianni has submitted clear and convincing proof of Alfredo's noncompliance with the Modified Preliminary Injunction.

However, as stated above, "[t]he failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt." *Dunn v. N.Y. State Dep't of Labor,* 47 F.3d 485, 490 (2d Cir. 1995). Rather, the movant must show that " 'the contemnor was not reasonably diligent in attempting to comply' " with the order. *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2002 WL 2012618, at *6 (S.D.N.Y. Sept.3, 2002) (Leisure, J.) (quoting *Local 1804-1,* 44 F.3d at 1096). The Court is satisfied from the testimony at the evidentiary hearing that Alfredo made reasonable efforts to ensure that his name was not used in connection with the event. Alfredo was assiduous in his removal of tags or labels that would identify the donated items as "Versace" items. Lane testified that Alfredo told him that his name could not be used in connection with the promotion of the goods in any way. Lane's failure to communicate this instruction to the others involved in the auction,

Ghougasin, who states that she traveled with Alfredo to North Carolina in late September-early October 2001, and that Alfredo met with representatives of Alternative Brands while in North Carolina. (Ghougasin Aff. ¶ 2.) Ghougasin does not indicate the basis of her knowledge that Alfredo met with Alternative Brands

representatives. In addition, Ghougasin states that she has "in [her] possession receipts verifying [her] trip" (Ghougasin Aff. ¶ 2), but does not include any such documentation as an exhibit to her affidavit. Accordingly, the Court gives the affidavits of Van Deventer and Ghougasin little weight.

and his failure adequately to inspect the invitations, Internet advertisements, bid sheets, and catalog, cannot be attributed to Alfredo. While it may be a reasonable inference that Alfredo would have seen the invitations and/or advertisements prior to the event, or the bid sheets and catalog during the event, there is no evidence in the record supporting that version of events. Therefore, the Court is satisfied that Alfredo used reasonable diligence in attempting to comply with the requirements of the Modified Preliminary Injunction, and finds that Alfredo is not in contempt with regard to his participation in the May 2005 auction.

## B. *Mark Versace Boutique*

■ As it stressed at the hearing, the Court, as the trier of fact, has given Alfredo's handwriting expert's testimony such weight as it finds it deserves. The Court has considered this expert testimony in the context of all the evidence, which includes a number of additional exemplar signatures (Pl.'s Exs. 14–22). It is true that Alfredo has raised questions concerning the authorship of the signature on the Letter of Intent, as well as that of the hand-printed notes on the Draft Agreement. If the matter rested entirely on these two documents, the Court might hesitate to find that Gianni has presented clear and convincing evidence of Alfredo's noncompliance with the Modified Preliminary Injunction. However, Gianni's allegations are far more extensive, and, when viewed against the backdrop of all the evidence presented, Alfredo's version of events must be rejected by even the most credulous fact-finder.

Most glaring are the circumstances of MVB's incorporation. MVB was incorporated in Jenkintown, Pennsylvania, using the same address as that of Alfredo's accountant, Marc Roseman. (*See* Jacoby

Aff. Ex. H; Papettas Decl. ¶ 7, Ex. A, Oct. 10, 2005.) Alfredo had previously used Roseman's office to set up another business in Pennsylvania. (*See* Jacoby Aff. Ex. G.) The Articles of Incorporation for MVB lists the company's business activity as "tabaco [sic] products." (*See* Jaooby Aff. Ex. H.) Alfredo has engaged in this same business in the past, *see, e.g., A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 288 (S.D.N.Y.2000), and has made clear to the Court that he wishes to pursue this business again in the future, *see A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 01 Civ. 9645, 2006 WL 90062, at *7 (S.D.N.Y. Jan.12, 2006). In an affidavit, Alfredo testified that "I recommended to my son that he use *an office that was available* in the suite belonging to my accountant." (Alfredo Versace Aff. ¶ 15, Oct. 19, 2005 (emphasis added).) Questioned about this statement under cross-examination, Alfredo was evasive to the point of incoherence:

Q. Mr. Versace, did you call Mark Roseman and ask him if it was okay for your son to use space in his office for the incorporation of whatever business you knew he wanted to incorporate?

A. No. I don't recall calling Mark Versace for that reason—I mean Mark Roseman for that reason.

Q. How did you know that Mr. Roseman had extra space in his suite?

A. How do I know?

Q. How did you know?

A. I don't know that, how much space he has. I've been to his office several times.

Q. How did you know that there was an office available in Mr. Roseman's suite?

A. I don't know that.

Q. Would you please look at paragraph 15 of your affidavit?

A. I don't know if he really would give my son an office.

Q. That wasn't my question. How did you know that there was office space available in Mr. Roseman's suite?

A. I went to Mr. Roseman several times because of tax problems. I went to his office.

Q. Was that two thousand—

A. That was the beginning of 2001, 2002, 2003.

Q. The beginning of 2003?

A. 2001, 2002, 2003.

Q. But in November of 2003 you didn't know if Mr. Roseman had space available in his office?

A. Mr. Roseman has been my accountant for many, many years and if I would request that he would give me a little space I doubt it if he would say no. (Hr'g Tr. 470:16–471:20.) Even if it were to credit Alfredo's statement that he recommended that his son use Roseman's address for purposes of incorporating MVB, the Court is unable to accept Alfredo's representations that he made this recommendation with no knowledge of what business his son sought to incorporate. Beyond his close familial relationship with Alfredo, Mark Versace has not been unconnected to the business activities Alfredo conducted under the "Versace Boutique" names. Alfredo testified at the hearing that his son was involved in various design aspects of the business (Hr'g Tr. 420:8–10), and that his son was a signatory on bank accounts for Alfredo's businesses and had the authority to sign checks on Alfredo's behalf [18] (Hr'g Tr. 420:11–16).

Alfredo's claim that he had no involvement with MVB is also undercut by his relationship with Marina Kats, the lawyer who helped file the incorporation papers for MVB. (Jacoby Aff. Ex. I.) Alfredo admits to having met with Kats on multiple occasions. (Hr'g Tr. 370:3.) One of the occasions Alfredo met with Kats was a business meeting that Alfredo and Papettas attended in Philadelphia [19] along with a woman named Alicia Holtzon. (Hr'g Tr. 333:24–334:20, May 10, 2006; Hr'g Tr. 412:18–413:24, May 11, 2006.) Holtzon is a notable figure in these proceedings due to her participation with Alfredo in certain 2002 negotiations with QVC, Inc., concerning an agreement to sell handbags and belts using the "Designed by Alfredo Versace" label.[20] (Hr'g Tr. 45:9–50:4, July 29, 2004.) These negotiations collapsed when the Court issued the September 3, 2002 Opinion and Order, barring Alfredo from using the "Versace" name, with or without a disclaimer, anywhere in the world. (Hr'g Tr. 49:22–50:4, July 29, 2004.) Alfredo testified that he attended the Philadelphia meeting for the purpose of helping Holtzon "design a handbag line that she would later put on QVC." (Hr'g Tr. 412:24–

---

18. Indeed, Gianni has produced a check for $50,000 signed by Mark Versace, against the account of "Versace Boutique, Ltd." (Adinolfi Decl. Ex. D.)

19. Alfredo was not certain of the date of the meeting, but conceded that it occurred after the Court's September 3, 2002 Opinion and Order. (Hr'g Tr. 413:19–21, May 11, 2006.) According to Papettas, the meeting occurred in the spring of 2004. (Papettas Decl. ¶ 11, Oct. 10, 2005.)

20. Holtzon's occupation is the subject of some mystery. Testifying before the Court in July 2004, Alfredo described Holtzon alternatively as working as an "agent" for QVC (Hr'g Tr. 46:3, July 29, 2004) and as performing "PR work" (Hr'g Tr. 48:18, July 29, 2004). In the evidentiary hearing for Gianni's contempt motion, Alfredo testified that Holtzon "designed handbags" (Hr'g Tr. 334:4, May 11, 2006), while Alfredo's girlfriend, Wendy Yang, told the Court that it was her understanding that Holtzon was a model (Hr'g Tr. 349:11–14).

413:1, May 11, 2006.) While the Court makes no finding here regarding whether Alfredo's participation in the Philadelphia meeting itself violated the Modified Preliminary Injunction, the circumstances of the meeting create a very strong inference against both the notion that Alfredo had no connection to the creation of MVB and that he had no contumacious business relationship with Papettas.[21]

Alfredo's credibility is furthered weakened by the declaration of Phelps, CEO of Alternative Brands. Even if the Court were to credit Alfredo's claims that all of his dealings with Alternative Brands took place in 2001, Alfredo has failed to account for how Phelps came into possession of packaging with the "Designed by Mark Versace" label, which Phelps claims Alfredo produced for him.[22] Phelps could not have come to possess this packaging through dealings with Alfredo in 2001— MVB, by every account that has been presented to the Court, had not yet been conceived, much less incorporated, at that time. Alfredo has produced no explanation in either of his two affidavits for how Phelps may have come into possession of this packaging. More important, Mark Versace—the person who, if Alfredo's version of events is to be believed, would have knowledge of the matter—does not address in his affidavit in any way the subject of Alternative Brands, either to explain his own interactions, if any, with Phelps or how Phelps might have received the "Designed by Mark Versace" packaging. (*See* Mark Versace Aff.) The Court can only conclude Phelps received this packaging from Alfredo, as Gianni alleges. This conclusion is supported by Papettas, who states that in the spring of 2004, Alfredo showed him "samples of the Mark Versace cigarettes, which were made in North Carolina." (Papettas Decl. ¶ 12, Oct. 10, 2005.)

Alfredo has failed to persuade the Court that he had no involvement with MVB. Having considered all the evidence presented, the Court finds that Gianni has shown by clear and convincing evidence that Alfredo violated the Modified Preliminary Injunction. The various packaging Alfredo provided to Papettas and Alternative Brands is in clear violation of the Modified Preliminary Injunction: For example, the cigarette packaging provided to Alternative Brands with the words "Designed by Mark Versace" plainly violates the injunction's prohibition on Alfredo's "making any use anywhere in the world of the name 'Versace,'" (Modified Prelim. Inj. ¶ 10, Jan. 27, 2003), as do the mockups of cigarette packages bearing the "Designed by Mark Versace" label provided to Papettas. Alfredo claims that MVB never engaged in business and that there was no physical entity "called the Mark Versace Boutique." (Def.'s Mem. Law Opp'n Mot. Contempt 5.) But such facts are not required to show a violation of the Modified

---

21. As for the reason for Papettas's presence at the meeting, Alfredo lamely explained that his car had broken down, that he had asked Papettas for a ride, and that Papettas agreed to drive Alfredo from his home in Long Island to Philadelphia as a simple courtesy. (Hr'g Tr. 468:9–469:25.) According to Papettas, Kats represented herself at the meeting as Alfredo's attorney. (Papettas Decl. ¶ 11, Oct. 10, 2005.) Papettas testified that he and Alfredo went to Philadelphia for the purpose of "discussing business between Alfredo and his lawyer and the QVC lady." (Hr'g Tr. 303:22–23, May 10, 2006.)

22. Apart from his claim that he had no dealings with Phelps subsequent to 2001, Alfredo merely states that he "[had] reviewed the declaration[] of . . . Calvin Phelps and [found it] to contain blatantly false statements of fact." (Alfredo Versace Aff. ¶ 2, Oct. 19, 2005.) Therefore, with respect to its allegations of Alfredo's activities with MVB, Phelps's affidavit is uncontroverted by Alfredo.

Preliminary Injunction. The Modified Preliminary Injunction clearly states that Alfredo is enjoined from "using [the Versace name] . . . as part of a . . . business name . . . or trade name for any product, service, or business." (Modified Preliminary Injunction ¶ 9, Jan. 27, 2003.) Incorporating a business with the name "Versace" in the business name is by itself a violation of the Modified Preliminary Injunction. In addition, beyond the mere fact of its incorporation, MVB has indeed engaged in business in violation of the Modified Preliminary Injunction. MVB negotiated business deals. MVB had a logo designed. (*See* Papettas Decl. ¶ 10, Ex. D, Oct. 10, 2005). MVB provided cigarette packaging to venders (*see* Papettas Decl. ¶ 8, Ex. B, Oct. 10, 2005), and generally engaged in preparations to launch the worldwide distribution and sale of "Designed by Mark Versace" cigarettes (*see* Papettas Decl. ¶¶ 13–15, Oct. 10, 2005).

This Court previously has found the Modified Preliminary Injunction's restrictions against Alfredo's use of the "Versace" name to constitute a "clear and unambiguous" order. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F.Supp.2d 341, 353 (S.D.N.Y.2003) (finding that the Modified Preliminary Injunction is clear and unambiguous that "Alfredo could not use the 'Versace' name in any form of commerce"). Gianni has presented clear and convincing evidence of Alfredo's noncompliance. Therefore, Alfredo is in contempt of court.

## V. *Remedy*

The Court has found Alfredo in contempt for nonpayment of judgments, failure to monitor the Internet adequately, and his activities with respect to MVB in violation of the Modified Preliminary Injunction. However, the Court declines at this time to order specific sanctions against Alfredo.[23] Indeed, in connection with its past contempt findings, the Court has ordered a wide variety of civil contempt sanctions to coerce Alfredo's compliance with the Court's orders, and these measures have failed repeatedly. This decision marks the fifth time that Alfredo has been held in contempt in this case. In its March 31, 2004 Opinion and Order, in which the Court ordered Alfredo to surrender to the United States Marshall for imprisonment for his failure to comply with the terms of his most recent contempt order, the Court wrote:

> Throughout the pendency of this dispute, Alfredo Versace has repeatedly disobeyed and ignored orders of the Court, apparently unperturbed by the gravity of the proceedings against him. His continued contumacy seriously threatens Gianni Versace's legitimate business interests in its trademarks. Just as importantly, Alfredo Versace's continued contempt shows a disregard for the authority of the federal judiciary. It is not a new observation that the ability of a society to order its affairs through the rule of law depends on sound enforcement of the law and respect for the role courts play in this

---

**23.** Indeed, Gianni does not seek any specific sanctions, as Gianni's counsel made clear during summation at the evidentiary hearing:
We are not asking for money here because there is so much money we have already received that he can't pay. This isn't about money. My client doesn't want money, your Honor. My client wants its intellectual property rights protected. My client

brought this motion to have a record of what Alfredo Versace's conduct has been, a full and complete record. We just want a record that Alfredo Versace can't find it within himself to obey, understand and comply with the orders of this court. That is what my client is asking for.
(Hr'g Tr. 547:3–14, May 12, 2006.)

process. Repeated and unexcused failure to abide by judicial orders, such as that displayed by Alfredo Versace, strikes at the heart of this equation. Furthermore, the history of this proceeding has convinced the Court that further monetary penalties are insufficient to coerce Alfredo's compliance.

*A.V. By Versace, Inc. v. Versace, S.p.A.,* Nos. 96 Civ. 9721, 98 Civ. 0123, 2004 WL 691243, at *8 (S.D.N.Y. Mar.31, 2004). As noted above, Alfredo avoided imprisonment through a last minute agreement that set forth specific steps for Alfredo to purge himself of contempt. Now the Court finds that Alfredo was violating the Modified Preliminary Injunction through his dealings Papettas, even as he faced imminent incarceration.

Gianni seeks to have Alfredo sanctioned for criminal contempt for Alfredo's alleged perjury before this Court. On July 29, 2004, in sworn testimony before this Court, the following exchange between Gianni's counsel and Alfredo occurred:

Q. Okay. Let me turn to another topic, Mr. Versace. From February 4, 1998 through today, can you tell me what names, including business names and brands and trademarks, you've used or permitted to be used in sales or offerings for sale or advertising or distribution or other activities relating to goods and services.

MR. HOLZBERG: Since which date again?

MR. JACOBY: February 4, 1998.

A. Alfredo Versace, NAV Versace trademarks in China.

Q. Design by Alfredo Versace as well?

A. Yes, Design by Alfredo Versace after the Judge's order.

Q. And Alfredo Versace Boutique?

A. No label, that's only a business.

Q. But the question was going—I hoped was going to take in any name you used, not only as a trademark but also as a business name?

A. You mean like a banking?

Q. For any purpose at all.

A. Yes, Versace Boutique was used for banking.

MR. HOLZBERG: That's Canada, New York and Bahamas?

THE WITNESS: Yes.

Q. Anything else besides the four that you have just listed?

A. No, not to my knowledge, my recollection.

Q. Let me ask you about Alfredo Versace Boutique, and you've just indicated that there were three entities that had that name, and I just want to, for the record, confirm that one was Versace Boutique, Limited, which was a New York corporation at one point, another was Versace Boutique, Limited, which was a corporation up in Canada, and the third was Versace Boutique Inc., which was an entity in the Bahamas; is that correct?

A. Yes.

Q. Any others anywhere else?

A. No. .          .

(Hr'g Tr. 38:20–40:2, July 29, 2004.) This testimony would indeed appear to be false, as the Court has found that Alfredo had been transacting business under a "Versace Boutique" entity, viz., MVB.[24]

---

**24.** Alfredo characterizes Gianni's perjury accusation as a claim "that Alfredo Versace committed perjury, by not stating the existence of the Mark Versace Boutique, a company he was not affiliated with, and a company that was not conducting business, when specifically asked to answer questions regarding the *Alfredo Versace Boutiques.*" (Def.'s Mem. Law Opp'n Mot. Contempt 9.) To be sure, the Court already has found that Alfredo was

This is not the first occasion the Court has had to consider the possibility of perjury on the part of Alfredo. This Court has warned Alfredo on several occasions of the serious ramifications that would follow if the Court believed that Alfredo's testimony was untruthful. At a hearing on April 12, 2004, the Court reminded Alfredo that "to the extent sworn statements are made either in documents or in testimony in the court it could lead to a finding of perjury," and that "perjury by a party can lead to indictment and trial and separate conviction and jail time separate from contempt." (Hr'g Tr. 8:9–17, Apr. 12, 2004.) On June 17, 2004, the Court again warned Alfredo that he risked referral to the United States Attorney's Office for possible indictment of perjury if he were to lie under oath. (See Hr'g Tr. 26:18–22, June 17, 2004.) Indeed, the Court was so concerned with the possibility that Alfredo might perjure himself that it took the extraordinary measure of allowing him to testify from the counsel table at the July 29, 2004 hearing, so that he could talk to his lawyers off the record before answering the question. (See Hr'g Tr. 4:12–16, July 29, 2004.)

In the words of Chief Justice Warren Burger:

> Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is and even the solemnity of the oath cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.

*United States v. Mandujano,* 425 U.S. 564, 576, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). The Court is authorized by Title 18, United States Code, section 401, to "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority … as … [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401 (2000). Federal Rule of Criminal Procedure 42(a) provides that punishment for criminal contempt[25] must take place after "prosecution on notice." Fed.R.Crim.P. 42(a). The Court must give the defendant "notice in open court" of the prosecution, and the notice must "state the essential facts constituting the charged criminal contempt." Fed.R.Crim.P. 42(a)(1)(C). Finally, "[t]he court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice re-

---

affiliated with MVB, and that MVB was, in fact, conducting business. Moreover, Alfredo ignores the broad scope of Gianni's counsel's questions: Alfredo clearly was asked to list the "business names … you've used or permitted to be used in sales or offerings for sale or advertising or distribution or other activities relating to goods and services." (Hr'g Tr. 38:22–25, July 29, 2004.) To eliminate any confusion, Gianni's counsel reiterated to Alfredo that the question included "any name that you used, not only as a trademark but also as a business name …. [f]or any purpose at all." (Hr'g Tr. 39:9–12, July 29, 2004.)

**25.** To hold a defendant in criminal contempt, the government must "prove beyond a reasonable doubt that: (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful." *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir. 1995) (McLaughlin, J.). To prove the element of willfulness, the government must show that the defendant acted with " 'specific intent to consciously disregard an order of the court.' " *Id.* at 837 (quoting *United States v. Berardelli,* 565 F.2d 24, 30 (2d Cir.1977)).

quires the appointment of another attorney." Fed.R.Crim.P. 42(a)(2).

On the present record, there is reason to believe that Alfredo is in criminal contempt of the Court's orders. There also is reason to believe that Alfredo may have perjured himself before the Court. Therefore, the Court refers this case to the United States Attorneys' Office for investigation and, if the United States Attorney deems it appropriate, prosecution.

## CONCLUSION

For the reasons stated above, Alfredo remains in civil contempt for (1) failure to pay past judgments as required by the Court's prior orders and (2) failure to monitor the Internet for infringing web sites as required by the Court's prior orders, including the August 28, 2003 Opinion and Order. This matter also is referred to the United States Attorney for the Southern District of New York for investigation and possible prosecution for criminal contempt of court and perjury.

**SO ORDERED.**