# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

ROBERTO MENDEZ-SANCHEZ, aka
Carlos Lopez; aka Alberto; aka
Pecas; aka Beto,
             *Defendant-Appellant.*

No. 08-30044

D.C. No.
CR-06-00425-MJP-
003

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
March 11, 2009—Seattle, Washington

Filed April 23, 2009

Before: William A. Fletcher, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Nancy L. Talner, Seattle, Washington, for appellant Roberto Mendez-Sanchez.

Jeffrey C. Sullivan, Helen J. Brunner, and Matthew D. Diggs, U.S. Attorney's Office, Seattle, Washington, for appellee United States of America.

## OPINION

GOULD, Circuit Judge:

We consider the relationship between a motion to substitute counsel and an invocation of a defendant's *Faretta* rights. We hold that while a defendant may invoke his or her self-representation rights after a denial of a motion to substitute counsel, the invocation must be unequivocal. A request to represent oneself made while at the same time stating a preference for representation by a different lawyer and rearguing the change of counsel motion is insufficient to invoke *Faretta*.

## I

A federal grand jury returned an indictment against Defendant Roberto Mendez-Sanchez ("Mendez-Sanchez") accusing him and several other defendants of participating in a conspiracy to distribute, possessing with the intent to distribute, and distributing both methamphetamine and cocaine.[1] Several of the charged crimes carry a mandatory minimum of ten years of imprisonment. The district court appointed William Hines ("Hines") to represent Mendez-Sanchez and set trial for June 4, 2007.

Before trial Hines filed a motion to withdraw as counsel at Mendez-Sanchez's request. At the ex parte hearing on the motion, Hines stated that Mendez-Sanchez had accused Hines of "threatening him" whenever Hines discussed the evidence that would be presented at trial, and that Mendez-Sanchez did

---

[1]An immigration charge was dismissed on the government's motion.

not believe Hines on several points of law. Judge Pechman inquired whether Hines believed that Mendez-Sanchez had any mental health issues, and Hines responded that he did not believe so. Hines also detailed the plea negotiations: the government had offered to drop an enhancement for his leadership role in exchange for a plea. This deal would make Mendez-Sanchez eligible for a ten-year mandatory minimum sentence. Hines advised Mendez-Sanchez that he was facing twenty years if he went to trial because of his prior felony drug conviction. The plea negotiations were at an impasse because Mendez-Sanchez would not accept any offer of ten years or more but the government would not offer a sentence lower than ten years without Mendez's Sanchez's cooperation.

Judge Pechman then questioned Mendez-Sanchez, who stated that his lawyer was always threatening him with ten years imprisonment. Judge Pechman told Mendez-Sanchez that Hines could not dictate the terms of the plea agreement, he could only communicate the government's offers. Mendez-Sanchez responded: "but the other thing is — that we've never really talked about very clearly is how am I going to go to trial? There isn't any evidence against me. There have to be recordings; there have to be pictures. How can it be based on just someone's words?" Judge Pechman explained: "There is no requirement that one have pictures or recordings" to be convicted of these crimes. Mendez-Sanchez finally stated that he would like another lawyer because he was looking for less than ten years, but if he could not receive a better offer, maybe he would "sign off on it." The court granted his request for new counsel, and set a new trial date in November. After the hearing, Judge Pechman appointed Michael Kolker ("Kolker") to represent Mendez-Sanchez.

On August 16, 2007, the district court granted Kolker's request for a second attorney, appointed Michael Schwartz ("Schwartz") to represent Mendez-Sanchez with Kolker, and moved the trial date to January 7, 2008.

Mendez-Sanchez moved to substitute counsel again on December 21, 2007. Assistant United States Attorney Doug Whalley ("Whalley") opposed the motion on behalf of the government. Whalley stated that there would be no further plea offers; that eight co-conspirators had pled in this case and were awaiting sentencing, some of whom would likely be released with time served; and that one DEA agent was traveling from Central Asia to testify. Finally, Whalley detailed the volume of evidence that he would present: about sixty transcripts of recorded telephone conversations, several co-defendants' testimony, and evidence of undercover drug purchases from Mendez-Sanchez. Any new counsel would require a continuance to prepare for trial, which would cause witnesses to languish in jail and fail to accommodate the DEA agent traveling from Central Asia.

After this discussion, the district court cleared the courtroom and asked Mendez-Sanchez's attorneys, Schwartz and Kolker, about the attorney-client relationship. Kolker said that he had visited Mendez-Sanchez many times, but whenever he tried to go over evidence, Mendez-Sanchez would leave the room. Mendez-Sanchez, according to Kolker, was convinced that the date on the search warrant demonstrated that it was a forgery and insisted Kolker call the magistrate as a witness to testify to the forgery. Kolker said that he had requested a second lawyer on the case because of his difficulties communicating with Mendez-Sanchez. He further stated that Mendez-Sanchez continued to insist that the videotaped depositions would not be admissible at trial, despite Kolker's advice to the contrary. Kolker's statements prompted Judge Pechman to ask whether Kolker was concerned about Mendez-Sanchez's competency. Kolker responded: "No. He understands who I am and he understands what my job is. I think he just doesn't want to hear what I'm telling him. And he just doesn't want to talk about it, basically."

The district court next asked Kolker's co-counsel, Schwartz, about his impressions of Mendez-Sanchez and their

relationship. Schwartz said that there were times when Mendez-Sanchez had listened closely and had responded to what he was saying, but there were other times when he had simply changed the subject, especially when he did not like what Schwartz was saying. Schwartz also asserted that Mendez-Sanchez had understood the complex concepts of a jury, his constitutional right to have a jury decide all counts, and the government's burden of proof. Schwartz explained that, following a discussion of these concepts, Mendez-Sanchez had waived his right to a jury on the immigration count. Kolker noted that "[t]he difficulty became when we were discussing things that I think are much more difficult for him not to grasp or understand, but probably to sort of admit to himself." He concluded by saying that he did not believe the problems with Mendez-Sanchez could be resolved by assigning new counsel, that Mendez-Sanchez insisted on a trial, and that Schwartz had no reservations about defending him.

The district court next questioned Mendez-Sanchez, who began by telling the court that he did not trust his attorneys, that they were "in cahoots" with the prosecutor, and that he did not want them in the hearing. When Judge Pechman asked why Mendez-Sanchez believed his attorneys were colluding with the prosecutor, Mendez-Sanchez explained that he knew that the police did not have a warrant and his attorneys claimed that they did. Mendez-Sanchez stated that when he asked the police if they had a warrant at the time they arrested him, they responded for him to "shut up." From this response he concluded that there was no warrant. He also detailed that the warrant his lawyers showed him had a different date originally and that the date had been changed. Judge Pechman asked Mendez-Sanchez if he knew what the government's final offer had been, and he responded "ten years."

Mendez-Sanchez then commenced his ambiguous *Faretta* demand: "Well, I don't want any lawyer anymore. What — I told them I want the paper to sign and that tell me how long

I'm going to be in jail. But they are — they're aware that I'm not guilty of all the things that they are saying." Judge Pechman asked if he was stating he wanted to sign a plea agreement, and Mendez-Sanchez responded: "Yeah, yeah. What's the point of getting another lawyer?" But then, in response to the same question asked again, Mendez-Sanchez answered: "No, no, I rather go to trial. That's my right. But not with [these] lawyers." The court asked what Mendez-Sanchez thought another lawyer could do for him, and he responded that he knew his current lawyers would not do anything, and then he began discussing the warrant and its apparent discrepancy in dates.

The district court asked Mendez-Sanchez's counsel to explain what issue Mendez-Sanchez had with the warrant. According to Kolker, it was a warrant that Magistrate Judge James Donohue had signed on November 29, 2006. Judge Donohue had begun to write "November" in the space for the date by which the warrant would have to be served, he then crossed that out, initialed it, and wrote the warrant must be executed by December 9, 2006. Kolker stated that Mendez-Sanchez thought this warrant was improper and that there was another secret warrant that Kolker was not showing him. Judge Pechman reviewed the warrant in question and explained to Mendez-Sanchez that, from the face of the warrant, and because she knew Magistrate Judge Donohue's signature, she could tell that the warrant was not a forgery. She stated that it seemed as if the magistrate judge had just accidentally begun to write November but he had initialed his mistake and therefore the warrant was, on its face, valid. The court next informed Mendez-Sanchez that his lawyers were obligated to explain what was likely to happen at trial and to help him make decisions based on that information.

Mendez-Sanchez responded "But I don't want these lawyers. I'm not going to risk my life with these lawyers." The court asked if he was asking to represent himself, and he replied that self-representation would be better and that he did

not trust these lawyers. The court deferred the full *Faretta* colloquy until the prosecutor had come back into the room.

Once the prosecutor was present, the court denied Mendez-Sanchez's motion to substitute counsel. The court explained that it had appointed for Mendez-Sanchez both Kolker and Schwartz after his initial problems with Hines, even though "it was [her] clear belief at the time that Mr. Mendez-Sanchez did not like the message that was being delivered by the government and was in fact assuming some other counsel would change that message." The court also stated that there were several defendants who could not be sentenced until after Mendez-Sanchez's trial was completed; that a witness was flying in from Asia; that the relationship problems between Mendez-Sanchez and his counsel were not personal problems but stemmed from Mendez-Sanchez's refusal to face his current situation; and that his counsel felt prepared for trial.

The district court next conducted a full *Faretta* colloquy. During the colloquy, Mendez-Sanchez responded in a coherent manner, demonstrated familiarity with the charges against him, and acknowledged that Judge Pechman did not think it was a good idea for him to represent himself. In response to Judge Pechman's ultimate question, "Is it still your desire to represent yourself?" Mendez-Sanchez equivocated: "Well, not with this lawyer, no. If you assign me a different lawyer, yes, I will go with the lawyer." Mendez-Sanchez then said "I understand that [a] lawyer knows more than I do. But this lawyer that are present here, they have done nothing for me ever, and from the beginning I knew that." Judge Pechman tried to clarify, asking "[s]o let me understand. You would prefer to have a lawyer, you do not want to represent yourself?" Mendez-Sanchez replied "I think [it] would be better if a lawyer will help me. But I hope that it would be a good lawyer, not like these guys."

Based on these responses, the district court found that Mendez-Sanchez had not unequivocally invoked his *Faretta*

rights, and therefore, Kolker and Schwartz continued to represent him.

The jury found Mendez-Sanchez guilty on all counts. The court sentenced him to 240 months, the mandatory minimum. He filed a timely notice of appeal.

On appeal, Mendez-Sanchez argues that Judge Pechman abused her discretion when she denied Mendez-Sanchez's motion to substitute counsel, that Judge Pechman should have offered Mendez-Sanchez a stand-by attorney during the *Faretta* colloquy, and that Judge Pechman plainly erred by not ordering, *sua sponte*, Mendez-Sanchez to undergo a competency evaluation.

## II

We review the denial of a motion for substitution of counsel for abuse of discretion. *United States v. Prime*, 431 F.3d 1147, 1154 (9th Cir. 2005). Under our established rule, we consider: (1) the timeliness of the motion; (2) the adequacy of the district court's inquiry; and (3) whether the asserted conflict was so great as to result in a complete breakdown in communication and a consequent inability to present a defense. *Id.*

**[1]** Applying this rule, the first salient fact is that Mendez-Sanchez's motion to substitute Kolker and Schwartz was not timely. Mendez-Sanchez made the motion little more than two weeks before trial—a trial that had been continued twice and involved significant discovery. A new counsel, if permitted, would have required additional time to prepare for trial. While timeliness is not dispositive, and sometimes a defendant would be unable to make a motion until shortly before trial—such as in a case where a defendant realized his or her counsel was not prepared—that was not the case here. *See id.* Mendez-Sanchez filed this motion on the same day as his plea deadline. This timing supports the district court's finding that

this motion stemmed from Mendez-Sanchez's unhappiness with his plea offer, and not because of a legitimate or new breakdown in communication.

**[2]** The second prong in our analysis is our conclusion that the district court's inquiry was adequate. The inquiry must be "adequate to create a sufficient basis for reaching an informed decision." *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000) (quotation omitted). Judge Pechman extensively questioned Mendez-Sanchez and his attorneys. The court was able to surmise from Mendez-Sanchez's statements that Mendez-Sanchez refused to accept the consequences of his crimes. Moreover, while some of the court's questions were open-ended, many questions were targeted toward understanding the crux of the disagreement between Mendez-Sanchez and his attorneys. *See United States v. Franklin*, 321 F.3d 1231, 1238 (9th Cir. 2003) (holding that open-ended questions were not inadequate where the questions allowed defendant and counsel to sufficiently detail the reasons for the request to substitute counsel). The court was therefore able to make an informed decision regarding the motion and the inquiry cannot be faulted. *See United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007).

**[3]** Mendez-Sanchez centers his argument on the third factor to be assessed under our rule— i.e., the extent of the conflict between Mendez-Sanchez and his attorneys. To meet this prong, a defendant must show that there was an "extensive, irreconcilable conflict" between himself and his appointed counsel. *United States v. Smith*, 282 F.3d 758, 763 (9th Cir. 2002). This conflict must have led to "a significant breakdown in communication that substantially interfered with the attorney-client relationship." *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 779 (9th Cir. 2001).

Doubtless here there was some level of conflict. Kolker stated that Mendez-Sanchez would leave the room or change the subject when his lawyers were speaking about something

Mendez-Sanchez did not want to discuss. Mendez-Sanchez asserted that he would prefer to represent himself instead of Kolker and Schwartz and continued to say so throughout the *Faretta* colloquy.

Mendez-Sanchez relies on *Adelzo-Gonzalez*. In *Aldelzo-Gonzalez*, the defendant moved to substitute counsel because of a conflict between himself and his attorney. 268 F.3d at 774. For example, Adelzo-Gonzalez's counsel had used bad language, had threatened to "sink [Adelzo-Gonzalez] for 105 years" if he refused to accept a plea, had tried to prevent him from filing motions, and even accused him of being a liar. *Id.* at 774-75. Adelzo-Gonzalez also said that he would prefer to represent himself rather than continue with current counsel. *Id.* at 778. We reversed the district court's denial of Adelzo-Gonzalez's motion to substitute counsel because we determined that the breakdown in the attorney-client relationship was severe. *Id.* at 779.

**[4]** While there are some facial similarities between *Adelzo-Gonzalez* and this case, there are important distinctions. Mendez-Sanchez had already requested and received new counsel. He and his former counsel had experienced the same conflict over the plea negotiations and the validity of the warrant. When Mendez-Sanchez stated that he did not trust his attorneys, the court properly inquired into why and told him, though he still did not believe it, that the attorneys were correct: the warrant was not a forgery, his attorneys could only relay to him the deals that the government offered, and there is no requirement that video evidence be introduced in a trial. Kolker and Schwartz demonstrated no animosity toward Mendez-Sanchez, unlike the attorney had in *Adelzo-Gonzalez*. When Mendez-Sanchez and his attorneys discussed issues that did not involve the evidence against him, such as waiving a jury on the immigration count, Mendez-Sanchez was able to have a productive conversation with them. The relationship between Mendez-Sanchez and his attorneys does not exhibit

the same sort of "striking signs of serious conflict" that occurred in *Adelzo-Gonzalez. See id.* at 778.

**[5]** In *United States v. Smith*, we affirmed a district court's denial of a motion to substitute counsel and held that the conflict between Smith and his attorney arose out of "general unreasonableness or manufactured discontent." 282 F.3d 758, 764 (9th Cir. 2002). Smith quarreled with his attorney about the wording of a discovery motion, and when Smith's attorney would not use his wording, Smith unilaterally cut off contact, stating that he did not want to "meet and discuss something and have nothing be done about it again." *Id.* at 763. Smith, like Mendez-Sanchez, had already received one substitute counsel. *Id.* at 762. While having already been granted a motion to substitute counsel once does not preclude Mendez-Sanchez receiving another lawyer, the fact that this was the same breakdown in communications that had occurred with his previous lawyer is significant. The nature of the conflict demonstrates that it may have been based on Mendez-Sanchez's general unreasonableness. It is unclear what could have been done differently: Mendez-Sanchez had three lawyers tell him what he did not want to hear, he had not listened to any of them, and the judge herself had told him the same thing. If Mendez-Sanchez had received other counsel, it is likely that the same conflicts would have arisen.

Finally, whatever conflict Mendez-Sanchez had with his counsel was not extensive or irreconcilable. *See id.* at 763. Mendez-Sanchez was able to communicate with his attorneys, they bore him no ill-will, and he stated that they were never rude to him. There must be limits on the ability of a defendant to gain new counsel when the defendant is acting unreasonably and especially where appointing new counsel would require a continuance with a consequent disruption to the court process. Here, we conclude that the district court did not abuse its discretion in denying the motion for new counsel.

## III

Mendez-Sanchez also challenges aspects of the district court's *Faretta* colloquy, and specifically contends that he should have been told that he could have standby counsel.

**[6]** In determining whether a defendant has made a knowing and intelligent waiver of counsel, the record must show that the defendant has been made aware of the nature of the charges against him, the possible penalties, and the risks of self-representation. *United States v. Hernandez*, 203 F.3d 614, 624 (9th Cir. 2000), *abrogated in part by Indiana v. Edwards*, 128 S.Ct. 2379 (2008), *as recognized in United States v. Ferguson*, No. 07-50096, 2009 WL 792485 (9th Cir. Mar. 27, 2009). Whether a defendant knowingly and voluntarily waives his Sixth Amendment right to counsel is a mixed question of law and fact reviewed *de novo*. *United States v. Marks*, 530 F.3d 799, 816 (9th Cir. 2008). A district court's finding that a defendant's waiver is equivocal is a finding of fact reviewed for clear error. *Id.*

**[7]** *Faretta v. California*, 422 U.S. 908 (1975) presented the Supreme Court with a question of dueling rights of major consequence in our criminal justice system. In a series of hard-fought decisions, the Supreme Court had recognized that "the help of a lawyer is essential to assure the defendant a fair trial." *Faretta*, 422 U.S. at 832-33 (citing *Arserginger v. Hamlin*, 407 U.S. 25 (1972); *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Powell v. Alabama*, 287 U.S. 45 (1932)). Any right to proceed without an attorney stood in juxtaposition. The Court acknowledged the "strong argument . . . that the whole thrust of [the right to counsel] decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant." *Faretta*, 422 U.S. at 834. Yet, the Court concluded that based upon the text, structure, and history of the Sixth Amendment, an independent and individual right to self-representation existed. *Id.* at 818-32. Conse-

quently, the Supreme Court recognized and respected the accused's choice to proceed without an attorney, even though this may lead to his or her own detriment. *Id.*; *see also id.* at 834 ("It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts . . . . [However,] although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' ") (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970)).

Because the rationale of *Faretta* permitted self-representation, even if it was likely to have been harmful, when there was a knowing and intelligent waiver, we recognize this constitutional right only where demanded after advice on the hazards of self-representation. *See id.* at 835 (requiring a knowing and intelligent waiver of the right to counsel before allowing self-representation). The Supreme Court held that a defendant must be told of the dangers of self-representation to permit an intelligent waiver of the right to counsel. *Id.* Otherwise, in the absence of candid advice from the trial court on the dangers and practical risks of a self-representation, we would have no confidence that a knowing and intelligent waiver had been made.

**[8]** While "the Constitution does not force a lawyer upon a defendant," *Faretta*, 422 U.S. at 814-15 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)), it requires that a defendant who wishes to waive his or her right to counsel do so unequivocally. *See Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989). This principle of our circuit law has often been followed. *See, e.g.*, *Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2000); *Hernandez*, 203 F.3d at 621.

The requirement that a self-representation demand be unequivocal follows from the nature of the dueling rights at stake in *Faretta* and the need to make a sensible accommoda-

tion of the individual and societal interests raised. *Faretta* itself makes clear the view that self-representation in most cases will have negative consequences. 422 U.S. at 834. But despite the potential ill-consequence of self-representation, we permit it because of our society's respect for individual dignity, once the individual has been fairly advised of consequences and has made a knowing and intelligent decision. Because the exercise of self-representation cuts off the exercise of the right to counsel, often to individual detriment, we recognize the right only when it is asserted without equivocation.[2] However, "[i]f [the defendant] equivocates, he is presumed to have requested the assistance of counsel." *Adams*, 875 F.2d at 1444.

After being advised of the hazards of self-representation in the *Faretta* colloquy, the criminal defendant must make a choice with eyes open. We will recognize a choice for the self-representation right when made knowingly and intelligently and when expressed without equivocation.

[9] A conditional waiver can be stated unequivocally, as for example when a defendant says in substance: "If I do not get new counsel, I want to represent myself." There is a condition, but the demand is unequivocal. In *Adams*, we held that a defendant who invoked his *Faretta* rights after the court denied his motion to substitute counsel, later asked for counsel after proceeding pro se, was then re-appointed his previous attorney, and then re-asserted his right to self-representation

---

[2]We have previously noted that the requirement that a defendant invoke his or her right to self-representation without equivocation serves two purposes. "First, it acts as a backstop for the defendant's right to counsel, by ensuring that the defendant does not inadvertently waive that right through occasional musings on the benefits of self-representation." *Adams*, 875 F.2d at 1444. Second, "[i]t prevents a defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation." *Id.* We avoid placing the district court in the impossible position of effectuating both rights at once by "forcing the defendant to make an explicit choice." *Id.*

had made an unequivocal waiver. *Adams*, 875 F.2d at 1445. We stated that "[w]hile his requests no doubt were *conditional*, they were not equivocal." *Id.*; *see also Hernandez*, 203 F.3d at 621-22 (determining the following request was unequivocal: "if you can't change [my attorney], I'd like to represent myself, with an interpreter"). The key fact in *Adams* was his re-invocation of his *Faretta* rights after learning that he would not receive a different lawyer. *See id.* We have held in other contexts that a conditional waiver was equivocal, as for example where a defendant says: "If the court will appoint standby counsel, I would like to represent myself." For instance, in *Salemo* and *Kienenberger*, we upheld two defendants' convictions after each one asserted his right of self-representation while also asking for standby counsel. *United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996); *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994). " 'Standby' counsel refers to the situation where a pro se defendant is given the assistance of advisory counsel who may take over the defense if for some reason the defendant becomes unable to continue." *Locks v. Sumner*, 703 F.2d 403, 407 n.3 (9th Cir. 1983). In *Kienenberger*, we determined that because Kienenberger asked to represent himself with standby counsel, he never knowingly and voluntarily relinquished his right to be represented by counsel. *Kienenberger*, 13 F.3d at 1356. Salemo also did not waive his right to counsel and assert his right of self-representation when he asked for standby counsel and that standby counsel be compensated. *Salemo*, 81 F.3d at 1460.

[10] Within this framework we examine Mendez-Sanchez's *Faretta* invocation and colloquy. During the hearing on the motion to substitute counsel, Mendez-Sanchez stated that he wished to go to trial, "but not with [these] lawyers," and then several minutes later he stated "I don't want these lawyers, I'm not going to risk my life with [these] lawyers." This time Judge Pechman asked if Mendez-Sanchez wished to represent himself, and Mendez-Sanchez stated that "that would be better." However, several minutes into the subsequent colloquy,

Mendez-Sanchez acknowledged that "I think [it] would be better if a lawyer will help me. But I hope that it would be a good lawyer, not like these guys." This statement, made after Judge Pechman had denied substitute counsel, does not unequivocally demand self-representation and is insufficient to invoke the right of self-representation permitted by *Farretta*. *See Jackson v. Ylst*, 921 F.2d 882, 889 (9th Cir. 1990). The district court did not clearly err when it found that Mendez-Sanchez's waiver was equivocal.

## IV

**[11]** Mendez-Sanchez also argues that Judge Pechman should have offered to appoint him standby counsel during the *Faretta* colloquy. We can see why Mendez-Sanchez might prefer a standby counsel if he represented himself, but under our established precedent there is no right to the assistance of standby counsel. *Locks*, 703 F.2d at 407-08; *see also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation . . . ."). Moreover, we have held that a defendant who wishes to represent himself or herself and also asks that he or she be afforded standby counsel has not unequivocally asserted his or her right to self-representation and waived his or her right to counsel. *See Kienenberger*, 13 F.3d at 1356. The purpose of the *Faretta* colloquy is to inform the defendant of his or her rights and determine whether, the defendant still wishes to represent himself or herself with eyes open. *Faretta*, 422 U.S. at 835. To require that a court conducting a *Faretta* colloquy inform a criminal defendant that he or she may or may not receive a standby counsel would do nothing to focus the inquiry for the defendants knowing and intelligent decision. Because there is no right to have a standby counsel appointed during self-representation, it follows that there is no right to have the court advise about the possibilities of standby counsel during the *Faretta* colloquy.

We hold that the district court's *Faretta* inquiry was sufficient and that the district court did not clearly err in finding

that Mendez-Sanchez had not unequivocally waived his right to counsel.

**V**

We next address Mendez-Sanchez's argument that the district court erred by not ordering *sua sponte* a competency evaluation. Because the issue of Mendez-Sanchez's competency is raised for the first time on appeal, we review the district court's decision for plain error. *Marks*, 530 F.3d at 814. "Plain error is (1) error, (2) that is plain, and (3) affects substantial rights." *United States v. Waknine*, 543 F.3d 546, 550 (9th Cir. 2008) (internal quotation marks omitted). "If these three conditions are met, we may then exercise our discretion to grant relief if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

**[12]** " 'Due process requires a trial court to hold a competency hearing *sua sponte* whenever the evidence before it raises a reasonable doubt whether a defendant is mentally competent.' " *United States v. Mitchell*, 502 F.3d 931, 986 (9th Cir. 2007) (quoting *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997)). In determining competence to stand trial, we ask whether the defendant has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and both a rational and a factual understanding of the proceedings against him. *See Marks*, 530 F.3d at 550. A court considers the defendant's irrational behavior, his demeanor in court, and any prior medical opinions. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). An appellate court reviewing the failure to order a competency evaluation looks "to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence." *Mitchell*, 502 F.3d at 986 (quotation omitted). There must be "substantial evidence of incompetence" to hold the district court plainly erred by not initiating a competency evaluation. *Id.*

**[13]** Judge Pechman asked Mendez-Sanchez's attorneys whether his behavior could possibly be linked to incompetence on more than one occasion. Each time, however, Mendez-Sanchez's attorneys said no, that they believed Mendez-Sanchez could assist them. Nothing in these inquiries or in the responses of counsel would have prompted the district court *sua sponte* to convene a hearing on Mendez-Sanchez's competence to stand trial. Moreover, Schwartz's discussion of Mendez-Sanchez's ability to understand the arguments in favor of waiving a jury on the immigration count, and his decision to waive that charge being decided by the jury shows that he understood the nature of the legal proceedings. Further, Mendez-Sanchez stated that he knew that the government had offered him ten years imprisonment in exchange for a guilty plea, and he demonstrated an understanding of the nature of the proceedings against him during the trial court's *Farretta* colloquy. We cannot say, on this record, that Judge Pechman plainly erred by not ordering Mendez-Sanchez to undergo a competency evaluation.

**[14]** Finally, Mendez-Sanchez argues that while he may have been competent to go to trial, he was not competent to reject a plea offer. Under our precedent, there is no difference between the level of competence needed to plead guilty and that to stand trial. *See Godinez v. Moran*, 509 U.S. 389, 399 (1993) ("If the *Dusky* standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty."). Mendez-Sanchez relies upon *Indiana v. Edwards*, 128 S. Ct. 2379, 2384 (2008), in which the Supreme Court established higher levels of competency necessary for self-representation than are necessary to stand trial. However, *Edwards* does not address competency to reject a plea offer and it does not overrule or undermine the Supreme Court's prior precedent of *Godinez*, which forecloses Mendez-Sanchez's argument that he was not competent to reject the plea offer.

## VI

For the foregoing reasons, we hold the district court did not abuse its discretion by denying Mendez-Sanchez's motion to substitute counsel. We further hold that his waiver of counsel under *Faretta* and his demand for self-representation were not unequivocal and therefore he did not properly invoke his right to self representation. Further, we hold that the district court was not required to advise Mendez-Sanchez that standby counsel may be made available to him if he represented himself. Finally, we hold that the district court did not err by not initiating *sua sponte* a competency evaluation with regard to Mendez-Sanchez's competency to stand trial or to refuse to enter a plea agreement.

**AFFIRMED**.